# THE NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY *vs.* ISAAC O. SWAIN.

*Liability of Corporation for the Fraud of Agent—Concealment of Cause of Action a Fraud—Limitations—Evidence—Improbable Statements—Apparent Authority of Agent—Questions for the Jury—Instructions.*

In an action against an Insurance Company for the alleged fraud of its agent in collecting from plaintiff by false statements two premiums for insurance when only one was due, evidence is admissible to show what commissions the agent received on the first premium.

Plaintiff, in an action of deceit where the defendant pleaded limitations, alleged that he had been kept in ignorance of the fraud and was first informed of it shortly before beginning the action by one B. *Held*, that, since under the pleadings it was material to show when plaintiff first became aware of the alleged fraud, it was competent to prove by B that he did have an interview with the plaintiff at a certain time and what then passed between them.

An action of deceit must be instituted within three years from the time the cause of action accrues, but under Code, Art. 57, sec. 14, "where a party has a cause of action of which he has been kept in ignorance by fraud of the adverse party, the right to bring suit shall be deemed to have first accrued at the time at which such fraud shall or with ordinary diligence might have been known or discovered." *Held*, that under this statute it is not necessary to show a distinct and independent fraud by the defendant, for the purpose of keeping an injured party in ignorance of his cause of action, but the subsequent concealment of a fraud, or a failure to disclose it, is itself a fraud; and if the defrauded party is thereby kept in ignorance of his right of action he is kept in ignorance by the "fraud of the adverse party."

In cases where a fraudulent concealment by the defendant of the plaintiff's right of action is relied on to remove the bar of the Statute of Lim-

. itations, it is for the jury to determine whether the suit was instituted within the statutory period ·after the fraud was or with ordinary dili-
· gence might have been discovered.

The fact that the false statement relied on as the basis of an action of deceit was absurd and improbable, and would not have been believed by
· any sensible man, does not preclude the jury from finding that the plaintiff, a simple, credulous man was deceived by such statement. And ˎit is as much a fraud to deceive a credulous person with an improbable falsehood as it is to deceive a sagacious person with a plausible one.

When the agent of an insurance company is authorized to collect premiums due on policies and to inform applicants how much to pay for pol-
· icies and when to pay, and such agent collects a premium not due by means of false representations, the evidence is legally sufficient to allow the jury to say whether the agent in obtaining the money by such false statement was acting within the apparent scope of his authority.

When a fraud is committed by the agent of a corporation, acting within the scope of his employment but without the knowledge of his principal, the concealment or failure to disclose the fraud removes the bar of the Statute of Limitations against the defrauded party, who is entitled to bring suit against the corporation within the statutory period after he discovers the fraud, or by the exercise of ordinary diligence could have discovered it.

In an action against an insurance company for the fraud of its agent, the plaintiff's evidence was to the following effect: In July, 1897, upon the solicitation of an agent, plaintiff signed an application for a policy of life insurance and then gave his promissory note for the premium, payable in six months.  Shortly afterwards the agent falsely represented to the plaintiff that the company demanded another premium.  Plaintiff made this payment in cash and he received subsequently from the company
. a receipt for the payment of one premium together with the policy. When his promissory note became due he paid it to the purchaser thereof.  Plaintiff was an illiterate man and did not read the policy. When notified that another premium was due, plaintiff surrendered his
. policy to the company and received one for a smaller amount which he allowed to lapse.  In 1902 plaintiff showed the insurance papers in his possession to one B and explained the trasaction to him.  B told the plaintiff that he had been defrauded and this was the first knowledge he had that the agent had fraudulently collected two premiums from him for the same year, only one of which he had transmitted to the defendant company.  *Held,* that it was for the jury to say whether the agent was acting within the scope of his employment in collecting both
. premiums; and that there was sufficient evidence to go to the jury to show that the plaintiff had been kept in ignorance of his right of action by the defendant's concealment.

*Held,* further, that a prayer is erroneous which instructs the jury that the

plaintiff is entitled to recover if they find the above-mentioned facts only and does not require them to determine affirmatively that the agent in collecting the two premiums was acting within the scope of his employment, actual or apparent.

Appeal from the Superior Court of Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Edward Duffy* (with whom were *Bond & Robinson* on the brief), for the appellant.

The first exception is as to the legitimacy of testimony showing the rate of commission, the appellant paid to agents. It was admitted, evidently on the theory that the larger the commission the greater the desire to sell, and the greater the desire to sell, the greater the inducement to commit fraud. Therefore, the more likely that the agent did commit fraud, and that the plaintiff's testimony thereon is true. It could have been admitted on no other theory, and the proposition stated in this way shows its fallacy. As an abstract proposition, one can say that an agent who gets a larger commission is more likely to commit fraud than one who gets a smaller; but if one gets down to the concrete, the argument falls. One cannot say that Smith is more likely to commit fraud than Jones, because he gets a larger commission. It falls because the moral makeup is left out of consideration. Smith might be of such a temperament that he could not be dishonest if he tried, and Jones of such that he could not be honest if he tried. We have known of such people.

Again, the question went to the commission on the first premium. After the appellee had shown that he had the benefit of the policy for one year, the only issue in the case was whether or not the agent had swindled the appellee out of a second premium which was not due, and which if he did, he would not very likely turn over to the appellant. Now, how could you tend to prove this by proving what the agent got out of the first premium?

This action was commenced in June, 1903, practically six years after the occurrence of the alleged cause of action. Swain knew in 1897 every fact that he knew in 1903. He knew during all these years that he had taken out the policy with the understanding that he was to pay one annual premium; he knew that he had paid two within a few days of each other; he thought that that was pretty stiff insurance, especially as towards the end of the policy year he was called on to pay another. He thought that he was paying two years' premiums. He comes to the conclusion that he could not afford a ten thousand dollar policy, so he applies to have it reduced at the end of the policy year. He is advised then to pay two premiums so his policy will have a paid-up value, and his attention is called to the fact that he has only paid one premium. He decides to and does reduce his policy to one thousand dollars, which he also continues for one year and then allows to lapse; he knows that after he takes out his one thousand dollar policy his ten thousand dollar policy is no longer in force. All the foregoing are the facts which make up and tend to prove his cause of action. He knew them all, and in 1903, he is told that those facts which he knew in 1897—not those and some others which he afterwards learned —constitute a cause of action.

Under Code Art. 57, sec. 13, where a plaintiff has been kept in ignorance of his cause of action by the fraud of the defendant he is allowed to bring suit on his cause of action within three years. (*a*) From the time he discovered the fraud, or (*b*) from the time he might have discovered it by the use of ordinary diligence.

This statute first received construction in the case *Wear* v. *Skinner*, 46 Md. 257, in which case it was held that where a party is guilty of fraud and conceals it, the act of concealment is the fraud which keeps the plaintiff in ignorance of his cause of action, or in other words that it is only necessary to prove the original fraud and its concealment to bring the case within the statute.

Now, what is meant by "ignorance of his cause of action?"

Evidently not ignorance of his right to sue or of his remedy, but ignorance of the facts on which his cause of action depends. Right here is shown the viciousness of the testimony of Bridges. Swain tells him the facts on which he bases this cause of action, and Bridges tells him that from those facts a cause of action arises.

Swain was ignorant of his remedy, but was not ignorant of the facts on which his remedy depended. Mere ignorance of one's remedy has never been an excuse for not pursuing it. *Abell* v. *Harris*, 11 G. & J. 367, 372. Nor is it an excuse under this statute. *State* v. *Henderson*, 54 Md. 332.

Again, Swain was allowed three years from the time he discovered the fraud. It has been definitely settled as to what is meant by discovery of the fraud.

"Either the fraud itself or the facts and circumstances which will enable him to establish it in a Court of justice must be known to him or within his reach before he can be said to have 'discovered' the fraud." *Am & Eng. Ency.*, vol 19, p. 251.

Is it not perfectly clear that Swain comes under this clear exposition of the law? Did he not know in 1897 every fact that was necessary to prove the fraud? Again, he had three years from the time he could have discovered the fraud by the use of ordinary diligence. This is another way of saying that limitations begin from the time of constructive notice. "Notice of facts, which would put a man of ordinary intelligence or prudence on inquiry, is in the eye of the law equivalent to knowledge of all the facts which a reasonable, diligent inquiry would disclose." *Am. & Eng. Ency.*, vol. 19, p. 251; *Higgins* v. *Crouse*, 147 N. Y. 411; *Farnham* v. *Brooks*, 9 Pick. 245, 246; *Wood* v. *Carpenter*, 101 U. S. 135.

Now, can there be any doubt that Swain, during all these years, had, if not actual, at least, constructive notice of the fraud? He was suspicious, to say the least, of the whole transaction. That is what prompted him to submit the matter to Bridges. He knew from Savage that the company claimed that he had paid but one premium. He knew on the con-

trary that he had paid what in one place he says he thought was premiums for two years, and just afterwards, he says he did not know at that time what the second premium was for. Surely it can hardly be contended that he did not have constructive notice,  If he knew enough to put him on inquiry in 1903, he knew enough to put him on inquiry with Savage, and he is presumed to have known in 1898, what that inquiry would have divulged.

The defendant never knew, until just prior to bringing this action of the fraud.    It did not receive the second premium and thus become a party to the fraud.    This Court has said, in *Wear* v. *Skinner*, that where a party is guilty of fraud, the subsequent concealment of it is the fraud that keeps the plaintiff in ignorance of his cause of action.

How, therefore, can you have a plaintiff kept in ignorance of his cause of action by the fraud of the defendant, where the defendant never knew of the original fraud?    The cases hold that you cannot.    *Wood* v. *Williams*, 142 Ill. 269; *Stevenson* v. *Robinson*, 39 Mich. 160; *Wood, Limitations*, sec. 276, p. 661.

As far as the appellant was concerned, Eichelberger was the only person who knew of the fraud, and he left the employ of the company shortly after the transaction.    It is, therefore, submitted that the appellant, which never knew of the fraud, was not keeping the appellee in ignorance of his cause of action when the knowledge of the fraud was solely in an agent, who had long since left the employ of the appellant.

The question arises, however, as to whether Eichelberger was the agent of the appellant in the collection of the second premium.    The Court was asked by the defendant's fifth prayer to instruct the jury that he was not.    The Court refused to do this, and the defendant excepted.    As a matter of fact, the collection of a second year's premium was outside of the authority of Eichelberger.    He had no right to collect it; that would have to be paid to Savage.    Now, while it is definitely settled that a corporation is responsible for the fraud of its agent, yet it is only responsible when such fraud is committed

in carrying out a transaction committed to such agent in the course of his employment. *Lamm* v. *Port Deposit*, 49 Md. 233; *Western Md. Railroad* v. *Franklin Bank*, 60 Md. 36.

Eichelberger was the local agent of the company. There is no evidence to show what were his particular duties as local agent or what are the general duties of local agents of life insurance companies; no evidence to show that. the act complained of, which he did perform, came within the class of acts which he was authorized to perform. Eichelberger had made the contract between the company and Swain, and under it the company agreed to insure Swain and Swain agreed to pay it four hundred and twenty-nine dollars per year. In this way, the obligation of each to the other were fixed. Now, how can an agent be acting within the scope of his authority when he demands payment on a contract under which such payment is not due? A corporation may have an agent to collect the money due it, and any fraud that he perpetrates in dealing with a party from whom the money is due becomes the fraud of the corporation, but to say that such agent can go to A, B or C, who don't owe money and deal with them, and in such dealings represent the corporation, is pretty far fetched.

If the case should have gone to the jury, then both the plaintiff's prayers are vicious, (1), because they told the jury that if they should find that Eichelberger was the agent of the company on August 2nd, the plaintiff was entitled to recover the second premium. This premium was paid some days after that date. The jury should have been required to find that he was the agent of the defendant at the time he collected the second premium, for if the jury should believe from the facts that he was not the agent at that time, the plaintiff would not have been entitled to a verdict. They should also have been required to find not only that he was the agent on that day, but that he was acting within the scope of his authority. (2) Because they told the jury that the plaintiff was entitled to recover if they should find that he was kept in ignorance of his cause of action by the fraud of the agent and his concealment of the same, whereas for the plaintiff to recover they

must find that he was kept in ignorance by the fraud of the (adverse party) defendant and its concealment of the same. (3) Because there was no evidence to show that the agent's statement that Swain would procure an investment that would pay six per cent on every premium paid in was false. The testimony, as far as it went, showed the contrary, as he received a dividend of fifty dollars and fifty cents at the end of the year. (4) Because there was no evidence that the agent stated that the second premium was due. What he did was to demand another payment, and said that the company demanded another payment. (5) Because there was no evidence to show that Swain received a receipt for the payment of the cash and bank stock, countersigned August 7th. Swain specially testified that he got a receipt for neither payment.

*W. Burns Trundle* and *Edwin T. Dickerson*, for the appellee.

The Act of 1868, ch. 357 (Code, Art. 57, sec. 13), is a remedial statute, and gives to the plaintiff at law the same defence to a plea of limitations, by replying the statute, as the plaintiff in equity had, to that plea to his bill. The rule in equity was and is, if the proof shows that the plaintiff was defrauded and kept in ignorance of his right of action by the fraud of the defendant, his right of action shall be deemed to have first accrued when such fraud shall have been, or with usual and ordinary diligence might have been discovered. Such is, since the statute, the rule at law. When the fraud is successful, whereby the truth is concealed, and the plaintiff is deceived and befooled, and, believing the false statements of the defendant or its agent to be true, acts thereon to his detriment, no new affirmative act of concealment is necessary to be proved. Whether or not the plaintiff was so kept in ignorance of his right of action by the fraud of the defendant, and whether or not the fraud was, or with usual and ordinary diligence, might have been known or discovered by the plaintiff, are questions of fact for the jury. *Wear* v. *Skinner*, 46 Md. 257; *Gibbs* v. *Guild*, 9 Q. B. D. 59, 65, 67; *Dorsey M. Co.*

v. *McCaffrey*, 139 Ind. 545, 554; *Rosenthal* v. *Walker*, 111 U. S. 185; *Dean* v. *Ross*, 178 Mass. 397, 401.

Whether or not the plaintiff's failure to discover the cause of action within three years after the same accrued, was due to the failure on his part to use due diligence, or to the fact that the fraud of the defendant's agent so successfully concealed his cause of action from him, that he was unable to discover it by the exercise of due diligence, is a question of fact for the jury. *Faust* v. *Hosford*, 93 N. W. 58, 59; *Barndt* v. *Frederick*, 78 Wis. 1, 12; *Wear* v. *Skinner*, 46 Md. 269. *Barndt* v. *Frederick*, was an action of deceit to recover back money paid for stock in the Peerless Mine Co., as the result of a prospectus falsely representing that the company had $1,500,000 worth of silver ore on the dump ready to be crushed. Even though the false representation be extravagant, the Court is not justified in holding, as a matter of law, that the plaintiff could not have believed it.

That the agent had no express authority to collect more than $429 may be true; that it was within the scope of his authority to tell the plaintiff, making, through his solicitation, application for the insurance, what he, the plaintiff, must pay to get the policy and how he must pay it, is clear upon the record.

1. The agent was supplied by the defendant with the blank printed notes; he then had authority to take the note from the appellee on account of the premium. The receipt of the appellant, in evidence, acknowledges $429 received on account of the first premium.

2. Whether he had to pay any, and how much cash; what was the total sum in cash and notes, he would be required to pay, in order to get the policy, the appellee, being ignorant, could not know; he relied on the agent. As it was part of the agent's business, in the course of his employment, to inform a person induced by him to make applications for insurance, *how much* he must pay to get the policy and how it was to be paid, whether part note or part cash; any misapprehension by the agent on these points was in the scope of his employment and

bound the company.    When, a few days after the application
was written up by the agent and signed by the plaintiff, and
after the agent had got from the plaintiff his note for $429,
the agent again came to the plaintiff and told him he must
pay $429 in cash, that the company demanded it, he lied; but
he lied in the course of his employment as the agent of the
appellant.    Through that lie, the appellee has been defrauded
and the appellant is responsible for that fraud. *Lister* v. *Allen*,
31 Md. 547–8; *Globe Mutual Life Ins. Co.* v. *Wolff*, 95 U. S.
330; *Tenant* v. *Travelers Ins. Co.*, 31 Fed. Rep. 332.

BOYD, J., delivered the opinion of the Court.

On June 1st, 1903, Isaac O. Swain sued the Insurance
Company for an alleged fraud of its agent, by means of divers
false and fraudulent representations, whereby he was induced
to take out a policy of insurance on his life for an annual pre-
mium of $429.    The declaration contains three counts, in the
first of which it is alleged that the plaintiff paid the premium
with a promissory note, dated August 2nd, 1897, payable to
the order of the defendant six months after date; that on Sep-
tember 5th, he received the policy and during the month of
August the agent fraudulently and wrongfully demanded of
the plaintiff an additional sum of $429, as and for an additional
premium, falsely and fraudulently representing to the plaintiff
that it was then due and demandable and that he had been
sent by the defendant to collect it.    It then alleges that he,
in ignorance that it was not then due and demandable, paid
the additional sum of $429 and the agent transmitted it to the
defendant.    The second count makes the same allegations,
excepting it does not refer to the payment of the second pre-
mium.    The third sufficiently resembles the first to make it
unnecessary to refer further to it.    Each of the counts con-
cludes with the averment that by reason of the ignorance and
inexperience of the plaintiff and of the false and fraudulent
representations of the agent, and the concealment of the fraud
by him, the plaintiff was not aware of the fraud and did not
discover and could not by reasonable diligence have known or

discovered the fraud until some time in July, 1902.   The defendant filed the plea of the Statute of Limitations; one denying that the plaintiff, by reason of his ignorance inexperience, etc., was not aware of the alleged frauds, etc., until July, 1902, another alleging that he was aware of the alleged fraud three years before the institution of the suit, and general issue pleas. By some apparent inadvertence, the defendant plead that it did not commit the wrongs alleged, that it never promised and that it was never indebted, but no point seems to have been raised about that and issues were finally joined on all the pleas.

The trial below resulted in a verdict for the plaintiff in the sum of $600.95, being the amount of one annual premium and interest.   A judgment being entered on that verdict, this appeal was taken.   Two bills of exception embrace rulings on the admissibility of evidence, and the third includes the prayers—two of which were offered by the plaintiff, which were granted, and seven were offered by the defendant, the sixth and seventh of which were granted and the others rejected.

The plaintiff is a farmer living in the mountains of Allegany County about ten miles from Hancock.   He testified that one, Eichelberger, an agent of the Insurance Company, came to his house in July, 1897, and wanted him to take out a ten thousand dollar policy of life insurance; that he said that it was a good investment and would pay six per cent on the money paid in and he would get $15,000 cash at the end of twenty years, or $20,000 in paid up insurance; that Eichelberger wrote up the application for a ten thousand dollar policy and he signed it and gave his note for the premium, dated August 2nd, 1897, for $429, payable in six months, to the order of the defendant company; that when it became due he paid it to John R. Lashley, who had purchased it, and then burned it up.   The next day Dr. Steigers examined him and a day or two afterwards Eichelberger returned, when he said the company demanded another payment of $429, and he gave him $366.50, in cash, and five shares of bank stock, valued at $62.50.   He said he did not get a receipt from Eichel-

berger for the note or the last payment, but later he got from the company a receipt which was offered in evidence. That was countersigned by F. A. Savage, general agent, August 7th, 1897, and was a printed form used by the company. It states the amount of the annual premium, has blanks for amount of notes given on account of a first premium, has date at top of "August 1st, 1897," and states "Received of. Isaac O. Swain, cash, $429." He said he supposed he got the receipt about the 8th of August, and he received the policy by mail about the sixth of September. He testified that he put the policy in a drawer, that he did not read it; that he could not read it; that he could read very little, and could not understand it; can write his name, but cannot read anything to understand it. He received a notice towards the end of the year of another premum being due and finally after some correspondence with Mr. Savage he returned the ten thousand dollar policy to him and took one for a thousand dollars, which he permitted to lapse at the end of the year.

The plaintiff called Mr. Savage, the general agent, who testified that Eichelberger was the agent of the company in this transaction; that he was furnished with a rate book, blank applications, and blank printed notes for premiums; that when an application is signed by an applicant and the medical examiner the agent sends it to him and he forwards it to Boston; that the instruction to agents was not to take a note for full amount—applicant must pay at least twenty-five per cent—but there is nothing on the notes to show that. He also said that the premium receipt was always issued with the policy; that they are countersigned by him as general agent and "sent out in blank in some instances with the policy to the agent and our agent delivered that receipt to the applicant with the policy and does it the day he got the money, and the date over the counter signature is filled in by the agent. The date is not in my handwriting and I expect Eichelberger dated it the date he received the money."

1. The question was asked Mr. Savage "What commission did Eichelberger get on first premium?" That was objected

to and the objection being overruled that ruling is presented by the first bill of exceptions.    It is said that the object was to show an inducement on the part of the agent to procure insurance, as reflecting upon the question whether he made these alleged fraudulent representations.    As the reply of the witness was that the agent received fifty per cent of the first premium, it might in a case of this kind reflect to some extent upon the probabilities of the agent making these statements. It is true that one man might not be influenced by the prospect of securing for himself a large amount, while another would yield to temptation for a smaller sum, but in case of alleged fraud great latitude is allowed and it would be proper to prove that the agent had a personal interest in issuing the policy.    It was relevant for another reason.    The plaintiff was entitled to trace, if he could, the money paid by him into the hands of the company, for if he could have shown, for example, that the company had received both premiums from Eichelberger it certainly would have been admissible.    The question objected to might very well have led up to such an inquiry.    But at any rate we do not see how it could possibly have injured the appellant, for it would be more likely to help than hurt the company, before a jury, to prove that it only received $214.50 out of the $858.00 received by Eichelberger.

2. The plaintiff, in order to sustain the issue made as to the Statute of Limitations, claims that he did not know that he had been defrauded until. Mr. Bridges called on him in 1902 to take out some insurance.    He then told him that he had had insurance, showed him such papers as he still kept, and explained the matter to Mr. Bridges, who told him he had been defrauded.    The plaintiff claims that was the first knowledge he had that Eichelberger had been guilty of fraud.    Mr. Bridges was called as a witness and started to give his interview with the plaintiff.    The defendant's counsel objected to that and it was admitted subject to exception.    He then gave the details of the interview, substantially as the plaintiff had.    At the conclusion of the case the defendants moved "to strike out all the testimony of the

witness Bridges with reference to the conversation between him and the plaintiff, because the same is irrelevant." The Court overruled that motion, which ruling is contained in the second bill of exceptions.    Ordinarily of course a party cannot offer conversations between himself and another person (other than the opposite party to the cause), but in this instance the object of the testimony was to reflect upon the question, which was a material one under the pleadings, as to when the plaintiff became aware of what he now claims to be a fraud.    As he had sworn that he did not know that he had been defrauded until Bridges told him, it was competent to prove by Bridges that he did have an interview with him on the subject, and what he had done.    Some of the statements may not have been admissible, but the motion was to strike out all of the testimony of Bridges with reference to the conversation between him and the plaintiff, which could not have been done if any part of it was admissible.    The Court in passing on it stated in the presence of the jury the object of it, and with that statement we do not see how the defendant could have been injured.    It would be difficult to prove in any other way, than by calling the witness, the fact that he had explained to the plaintiff that he had been defrauded.    As reflecting upon the time when the plaintiff became aware of the alleged fraud, it was competent to prove the date of the conversation, and in order to fix the date some reference had to be made to what was said.

3.  The *sixth* prayer of the defendant, which was granted, in effect instructed the jury that the plaintiff could not recover the first premium paid—which we understand referred to the note.    That was upon the theory that as the plaintiff had the insurance for a year that premium paid for what he had received the benefit of.    Its *seventh* prayer, which was also granted, stated a number of facts which it was necessary for the jury to find in order to render a verdict for the plaintiff, and concluded by requiring them to find "That the plaintiff instituted this suit within three years after he discovered the fraud of defendant's agent, and within three years after he

could have discovered said fraud by the use of usual or ordinary diligence on his part."

Our statute provides that "In all actions where a party has a cause of action of which he has keen kept in ignorance by the fraud of the adverse party, the right to bring suit shall be deemed to have first accrued at the time at which such fraud shall or with usual or ordinary diligence might have been known or discovered." Code of 1904, Art. 57, sec. 14 (sec. 13 of Code of 1888). The case of *Wear* v. *Skinner*, 46 Md. 257, is the leading one in this State on the subject. JUDGE ROBINSON in delivering that opinion said it was well settled by *Courts of equity* that where a party has been injured by the fraud of another and such *fraud is concealed*, or is *of such character as to conceal itself*, whereby the injured party remains in ignorance of it without any fault or want of diligence on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." The Court held that the Act of 1868 (now codified as above) "was passed for the purpose of enabling parties to set up the fraud of the defendant in a *Court of law* as well as in a *Court of equity*," and that the "Legislature meant that the nature and character of the fraud, which a party was thus allowed to plead, should be governed by the well-settled rules of law on the subject, as recognized by Courts of equity and Courts of law at the time when the Act was passed." Accordingly it was held in that case that our statute did not mean that in all cases a party must commit a fraud *distinct* from, and *independent* of the *original fraud*, for the purpose of keeping the injured party in ignorance of his cause of action, and "where one practices fraud to the injury of another, the *subsequent concealment* of it from the injured party is *in itself a fraud*, and if he is thereby kept in ignorance of his cause of action, he is kept in ignorance by the fraud of the adverse party." The only other cases in this State on that statute are those of *State* v. *Henderson*, 54 Md. 332, and *Cummings* v. *Bannon*, an unreported case referred to in 66

Md. XIV (s. c. 8 Atl. Rep. 357). In the former this Court held there was no evidence of fraud and no concealment, and in the latter the facts upon which the plaintiff relied to show a fraudulent concealment were shown to be known to him for more than three years before suit.   Unless the contention of the appellant that if there was fraud it was that of *the agent*, and not of *the defendant*, be correct (and we will consider that later), it is manifest that the law as announced by the Court in *Wear* v. *Skinner*, required the Court to reject the *third* and *fourth* prayers of the defendant, as they asked the Court to say there was no evidence of fraud by the defendant.   The subsequent concealment of fraud practiced being itself a fraud, and the defendant having concealed or failed to disclose it, there was evidence tending to show that the plaintiff was kept in igorance of his cause of action within the very terms of the decision in *Wear* v. *Skinner*.

The defendant's *first* and *second* prayers were equally faulty because they sought to have the Court instruct the jury that the plaintiff did not sue within three years from the time he discovered or could by the use of usual and ordinary diligence have discovered the fraud.   That was a question for the jury. It may seem strange that any one could be misled by some of the alleged representations of this agent, yet it is possible that an ignorant man, such as the appellee is represented to be, could be made to believe just what he said Eichelberger told him.   He certainly must have believed that he had to make the second payment or he would not have made it, and he swore most positively that he did believe the statements and did not know they were false, until Mr. Bridges told him he had been defrauded.   In *Barndt* v. *Frederick*, 78 Wis. 1, it was argued that the alleged false representation was too absurd and incredible for any sane man to believe, and hence the plaintiff could not have relied on its truth.   The Court said, "It is difficult to draw a line beyond which human credulity cannot go, especially in speculations in mining stocks.   If the representations were so extravagant that sensible, cautious people would not have believed them, that is a proper consid-

eration for the jury in determining whether the plaintiff believed and relied upon them; but it does not preclude a finding that the plaintiff did so, nor relieve the defendant from liability for his fraud, if he committed fraud. It is as much an actionable fraud wilfully to deceive a credulous person with an improbable falsehood, as it is to deceive a cautious, sagacious person with a plausible one. The law draws no line between the two falsehoods." In *Kendall* v. *Wilson*, 41 Vt. 567, the Court said, "The law will afford relief even to the simple and credulous who have been duped by art and falsehood."

But as we have already intimated, "whether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury." *Faust* v. *Hosford*, 119 Ia. 97 (s. c. 93 N. W. Rep. 58); *Rosenthal* v. *Walker*, 111 U. S. 185; *Barndt* v. *Frederick*, *supra*. Under our practice if there be a total absence of evidence to establish such facts in favor of a plaintiff suing after the period fixed by the Statute of Limitations, the Court can so determine, as will be seen by reference to *Cummings* v. *Bannon* and *Wear* v. *Skinner*, *supra*, but, although we may think it strange that the appellee did thus remain in ignorance so long of the fact that he was defrauded, if he was, and that he did not make some inquiries about it, we cannot say there was no evidence on the subject to be submitted to the jury, or that the evidence shows he did not use such diligence as the statute requires. If it be true that Swain did not know that Eichelberger had not done anything which he did not have the right to do, and did not know that his other representations were false, his inaction is easily accounted for. If he had supposed he had been defrauded by Eichelberger it is altogether probable that he would have said something about it in his correspondence with Mr. Savage, but the latter did not intimate anything of the kind when he was on the stand.

The *fifth* prayer of the defendant asks the Court to instruct

the jury that there was no evidence that Eichelberger was the agent of the defendant in collecting the second premium. There was perhaps more evidence tending to show his authority to collect the cash than to take the note.  He actually remitted to the company its share of the cash, and the general agent sent the premium receipt to Eichelberger with the policy.  That receipt shows that the premium was paid in cash, and the note which he had previously taken was not due until the following February, and never came into the hands of the company, beyond Eichelberger.  Mr. Savage testified that he never allowed his agents to take a note until the policy was delivered, ·although he had blank notes in his possession. Eichelberger was undoubtedly clothed with power to receive the proper premium that was to be collected on this policy, and while his principal did not authorize him to collect two premiums for one year, it did give him considerable authority and he did impose on this ignorant man.  It was a part of the agent's business to inform an applicant for insurance how much he was to pay for his policy, and how he was to pay it, and it was admittedly within the scope of his employment to collect the first premium.  When therefore this agent was vested with such powers as he confessedly had, and during the course of the dealings between the company, through him, and the appellee, he represented to the latter that the company required this payment in cash, the Court could not, as a matter of law, declare that there was no evidence that Eichelberger was the agent of the company in collecting this premium, but it was a question that was proper to be submitted to the jury.

The only other question concerning the defendant's prayers is the one we referred to above which was intended to be raised by the *third* and *fourth*—that the evidence did not show fraud on the part of the defendant, but if there was any, it was that of the agent.  In *Tome* v. *P. B. R. Co.*, 39 Md. 36, this Court quoted with approval from *Story on Agency* (7 ed.), sec. 452, where the author, after saying a principal was not ordinarily liable in criminal proceedings for the acts of his agent, said, "Yet he is liable to third persons in a civil suit for the

*frauds, deceits, concealments, misrepresentations* (italics are ours,) torts, negligence, and other malfeasances, or mis-feasances, and omissions of duty of his agent in the course of his employment, although the principal did not authorize, or justify, or participate in, or indeed know of such misconduct, or even if he forbade the acts or disapproved of them. In all such cases the rule applies *respondeat superior;* and it is founded upon public policy and convenience; for in no other way could there be any safety to third persons in their dealings either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby in effect he warrants his fidelity and good conduct in all matters within the scope of the agency." That has been followed in *Western Md. R. R. Co.* v. *Franklin Bank*, 60 Md. 36, and *Lamm* v. *Port Deposit Co.*, 49 Md. 241, in all of which cases the doctrine was said to be applicable to corporations as well as to natural persons. There are some cases cited in 19 *Am. & Eng. Ency. of Law*, 249, to sustain the statement that the equity rule affecting the Statute of Limitations is confined to cases where the fraudulent concealment was by the defendant, or with his knowledge or consent, and that it does not embrace a case where the concealment or fraud is committed by an agent and the principal has no knowledge of or connection with it, but in the note on that page of the Encyclopedia it is said that where the defendant is a corporation, and can therefore act only through its agents, the rule of the text does not ordinarily apply. It would be a dangerous rule to announce at this day, when almost every conceivable kind of business is carried on by corporations, who must act through agents, and we cannot give our assent to it—especially in view of the prior decisions of this Court cited above. We think the *third* and *fourth* prayers were properly rejected.

It only remains to consider the two prayers of the plaintiff, and we are of the opinion that there was error in granting them. We have said, in considering the defendant's *fifth* prayer that the question whether Eichelberger was the agent

of the company in collecting the second premium was for the jury. We have stated some rules which might seem to impose a considerable burden on a principal for acts done by his agent. As those rules were in accordance with our understanding of the law, we of course had to be governed by them, but a principal's liability, under circumstances such as those in this case, is not unlimited and depends upon proof of important facts, some of which we think have been overlooked. Both prayers granted for the plaintiff wholly omit any reference whatever to the question whether Eichelberger was acting within the scope of his employment when he collected the second premium. Take the first, for illustration. It instructs the jury that, if they find that on or about the 2nd day of August, 1897, Eichelberger was the *duly authorized agent* of the defendant to *solicit insurance*, that he solicited the plaintiff and made the false statements therein recited, that the plaintiff believing his statements to be true was thereby induced to take out the policy and sign and deliver to the agent the note spoken of, in payment of the first premium, and afterwards in the month of August said agent falsely and fraudulently represented to the plaintiff that another premium was due, that defendant had sent him to collect it and wanted it in cash, when in fact the second premium was not then due, that the plaintiff paid it in ignorance of the fact that it was not due and believing and relying on the agent's statement that it was, and other facts therein stated, then they *must find their verdict for the plaintiff* for said sum of $429, with interest in their discretion. It did not require the jury to determine whether the agent was acting within the scope of his employment in *collecting the second premium*, but if the jury found he was a soliciting agent for the company and did the things mentioned, including the collection of said premium, the company was liable under the terms of the prayer, whether he had authority to collect it or not. Under the law it is not necessary to show that he had actual authority, an *apparent* authority in the exercise of his employment was sufficient, *Tome's case, supra*, but the company would not be liable for such an act of its

agent unless it was within the scope of his employment, actual
or apparent.    The plaintiff testified that the agent told him
the premium was to be $429, and after paying it once with his
note, it is certainly remarkable that he could be so easily in-
duced to pay it again, a few days afterwards.    If the agent
had already collected the premium once as the plaintiff says
he had, of course it cannot be assumed that he had actual
authority to collect it again, and therefore the Court should
have explicitly directed the attention of the jury to the ques-
tion whether he was acting within the scope of his authority.
It was an important question under the circumstances of this
case and the right to require it was not waived by the defend-
ant in leaving it out of the *seventh* prayer or in any other way.
In *Andrews* v. *Clark*, 72 Md. on p. 434, the Court said
"Whether the act or acts of the agent in question were within
the scope of the recognized powers or duties of such agent,
or were of the class of acts or transactions that the agent was
allowed to do, or perform in the name of the defendants, in
the course of their dealing with customers generally, *or with
the plaintiff*, were questions of fact that were properly sub-
mitted to the finding of the Judge, by the prayers of the plain-
tiff, upon the whole evidence."    That case was tried before a
Judge, sitting as a jury, and the defense made was, first, that
one Palmer was not the agent of the defendants at the time
of the act complained of; second, that if the plaintiff was then
entitled to treat Palmer as still in their employ the transaction
was not within the scope of his authority and therefore not
binding on the defendants; and, third, that the plaintiff in con-
ducting the transactions with Palmer was guilty of such neg-
ligence and want of ordinary care as to operate as an estoppel
and so preclude the right of recovery for loss sustained by
the fraud of Palmer.    The prayers of the plaintiff did prop-
erly submit the question whether the act was within the scope
of Palmer's authority, but as they did not submit the estoppel
the judgment was reversed.    In this case the defendant had
the right to have the question whether the collection of a
second premium was within the scope of Eichelberger's au-

thority (*real or apparent*) passed on by the jury and both of the plaintiff's prayers were defective for not submitting it. We have already shown, in passing on some of the defendant's prayers, that there was some evidence of such authority but it was for the jury to pass on, and a fact which was necessary to be found to entitle the plaintiff to recover. We do not think the special exceptions to these prayers were well taken and will not discuss them. For error in granting the plaintiff's two prayers, for the reasons given, the judgment must be reversed.

> *Judgment reversed and new trial awarded, the costs to abide the final result.*