MAGGIE MULLEN, Appellee, v. JAMES L. CALLANAN, C. A. DUD-
LEY and J. G. ROUNDS, Executors of the last will and
testament of JAMES CALLANAN, deceased, Appellants.

Conveyances: FRAUD: ESTOPPEL: EVIDENCE: DAMAGES.  Although a
1  vendor of land may have been entitled to set aside a conveyance
by quit-claim deed on the ground of mistake as to the true ownership,

yet where he fraudulently represented to a purchaser as a means of inducing him to reconvey the property that he had previously resold it to another, who held a prior unrecorded warranty deed, he thus waived his right to rely on the mistake, and was estopped from basing his conduct on some other ground. Evidence held to establish an estoppel.

Same: LIMITATION OF ACTIONS: FRAUD: NOTICE. An action to set aside a second conveyance of land on the ground of fraud and to confirm the title under a previous deed is cognizable in equity, and the statute of limitations does not commence to run until the fraud is actually discovered. The recording of a deed to another, bearing nothing upon its face to indicate fraud, did not under the facts of this case amount to notice. Damages may be recovered in such an action without converting it into one at law.

Same. Although an action might have been brought at law, or either at law or in equity, if defendant deliberately concealed plaintiff's cause of action, of which she had no knowledge or notice, the statute would not commence to run until discovery of the fraud.

Same: LACHES. Although an action for fraud was not commenced for many years after the fraud was committed, yet if the plaintiff proceeded with diligence upon discovery of the wrong, defendant cannot rely on the defense of laches.

Same: LIMITATION OF ACTIONS. Where plaintiff brought her action within one year after discovery of the fraud of her grantor, her action was not barred by a failure to present her claim to his executors within one year after their appointment.

Same: JURISDICTION: PARTIES. An action to remove a cloud upon the title to real property is of an equitable nature and one which cannot be tried in probate, but the executors of an estate involved are proper parties where relief in damages is sought.

Same: FRAUD: MEASURE OF DAMAGES. Where plaintiff was induced by fraud to reconvey land to her grantor and subsequently purchased it at an advanced price, she was entitled to recover the amount the land had increased in value between the dates of the two conveyances, even though she was repaid the amount of the first purchase and paid more than her land was worth for the second conveyance.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

TUESDAY, NOVEMBER 24, 1914.

SUIT in equity to set aside certain conveyances of real estate, for an accounting as to the rents and profits of the land

covered by the conveyances, to charge defendants as trustees of certain funds paid to the deceased, Callanan, and to require an accounting from them, and for general equitable relief. The entire action is based upon an alleged fraud perpetrated upon plaintiff by James Callanan, the deceased, in the matter of the sale of some lands in Calhoun county, Iowa. The defendants, who are the executors of the Callanan estate, appeared and answered the petition, denying the alleged fraud, pleading the statute of limitations and laches on the part of the plaintiff. They also denied the alleged trusteeship, and pleaded that plaintiff had a plain, speedy, and adequate remedy at law, and that plaintiff, having neglected to file her claim with them, the executors, within the time required by the special statutes with reference to the filing of claims against the estate of one deceased, is not entitled to maintain this suit. They also pleaded payment and satisfaction of plaintiff's claim. On these issues the case was tried to the court, resulting in a decree and judgment for plaintiff, and defendants appeal.—*Affirmed.*

*Coffin & Hippee,* for appellants.

*O. M. Brockett* and *Carr, Carr & Evans,* for appellee.

DEEMER, J.—Prior to the year 1889 James Callanan and James C. Savery constituted a partnership under the firm name of Callanan & Savery, with their main office in the City of Des Moines. The firm was chiefly engaged in the handling of what were known, in this state, as swamp lands, having succeeded to the rights of what was known as the American Emigrant Company. Callanan was also engaged in handling lands on his own account, title to much of which was held by tax deeds. The firm and Callanan occupied the same suite of rooms in a building in Des Moines, although they occupied separate rooms and kept their own books. As a rule they had their own employees, save that some of them acted for both;

and one or both had a regular attorney by the name of Davis, who had an office on the same floor as did the clients. One Shuck was in the employ of the firm, and had immediate charge of its business. John A. Lawless was an employee of the firm for some time prior to the year 1889, and entered into the employment of Callanan individually some time in the year 1890. During the interim he had a desk with the firm, and did some special business for them regarding particular lands. Prior to Lawless' employment by Callanan, one Atkins was in his (Callanan's) employ, and during the year 1889 Atkins was called away for two or three months and Lawless took his place. In order to facilitate business in the two offices, blank deeds bearing the signature of Mrs. Callanan, with her acknowledgment by Atkins, were kept to be used when Callanan's individual lands were sold; and deeds bearing the signature of Mrs. Callanan and of Mr. and Mrs. James C. Savery, with authority to Shuck, who was a notary, to take the acknowledgments of the Saverys, and of Atkins to take Mr. and Mrs. Callanan's acknowledgments, were kept to use in case of sales of lands belonging to the firm. In either case, according to the custom of the offices, all that was needed to complete the deeds was the signature and acknowledgment of James Callanan. The acknowledgments of Mrs. Callanan and of the Saverys were written, as a rule, as of the date that Callanan signed the deed or deeds, although in fact neither Mrs. Callanan nor Mr. or Mrs. Savery in fact appeared at that time. All the lands owned or held either by the firm or by Callanan were for sale at certain prices, and the details were usually attended to by their agents or employees. The lands in controversy, being the west half and the northwest quarter of the southeast quarter of a certain township in Calhoun county, Iowa, were entered upon the books both of the firm and of Callanan—on the former as swamp lands, and on the latter as lands held under a tax title; it being suggested that both pieces were claimed under railway land grants, and for that reason subject to tax sale.

Plaintiff and her husband lived in Calhoun county, and were anxious to procure the lands. They understood that Callanan had a tax title for or claim to the property, and also believed that they were claimed by the firm as swamp lands passing under assignment to the firm from the American Emigrant Company. One Mallison, living at Fonda, Iowa, was then an agent for both Callanan and the firm for the sale of the lands, and he conducted the negotiations with the Mullens looking to the purchase of the lands; he in turn doing business with Shuck. He first sold them the west half of the section in November, 1889, for the consideration of $840, and received a commission of $40 for making the sale. Later, and in December of the same year, he sold the other piece for the sum of $80. Mallison had all the correspondence with Callanan, or the firm, and he supposed that he was acting with and for the firm, and the correspondence so indicates. As a matter of fact a conveyance by quitclaim deed of the west half of the section was made by Callanan and wife and Savery and wife, and delivered to plaintiff November 22, 1889, and of the other piece on December 19th of the same year. Shuck, who attended to the matter, found the lands listed on the firm books, and forgot or neglected to see if they appeared on Callanan's books; but within a few weeks, if not days, he discovered that the lands were entered on Callanan's books, and was very much perturbed about the matter, as Callanan was a very careful and methodical man, and demanded the utmost exactness and care on the part of his employees. Shuck immediately reported the matter to Callanan, and Callanan upbraided him and complained to Lawless about his (Shuck's) negligence, and Callanan and Shuck immediately went to the attorney, Davis, for advice as to how to get rid of the conveyance; the claim being then made that the lands did not belong to the firm at all, but to Callanan individually. Instead of relying upon any claim of mistake as to the title to the lands, it was decided at the conference between the three men (Callanan, according to the record, suggested it himself) that he

(Callanan) and his wife should make a warranty deed of the lands to a nephew of Callanan's, one John Wiley, living in a foreign state, and that this deed should be antedated and signed and acknowledged as of date September 3, 1889, that this should be immediately recorded, and that they then would present the matter to the Mullens as if this were a bona fide antecedent sale, which, if correct, would take precedence over the transfer to the Mullens by the quitclaim deeds.

This scheme was immediately put into execution, and a warranty deed was drawn, signed by Callanan and his wife, and an acknowledgment made of it as of date September 3, 1889. At or before the time the deed was sent to the recorder of Calhoun county, inquiries were made to ascertain whether or not the Mullens had recorded their deeds, and also as to whether or not they had sold either piece of the property. It was found that the deed to plaintiff was recorded, but that so far as the record shows the property had not been sold by her, and so, without any actual delivery of the deed to Wiley, the grantee, this purported deed to him was placed of record. As soon as this was done, Shuck, representing either Callanan, or the firm, or both, wrote to the agent, Mallison, and asked him to secure a cancellation of the Mullen deed. Instead of telling him the truth, it was represented that the deed to plaintiff was made through mistake, in that through oversight they had sold and conveyed, by warranty deed, the same land some time before their negotiations with Mullen, and that he (Mallison) must help them out of the trouble, and get the Mullens to reconvey the land upon a return to them of the purchase money and something for their trouble. It was also suggested to him that, as the Mullens held only a quitclaim deed, a prior warranty deed, although unrecorded, would take precedence over their quitclaim and deprive them of their supposed title. Mallison conveyed this information to the Mullens and they immediately sought the advice of attorneys, and were advised by these lawyers that an unrecorded warranty deed would be superior to and take precedence over a subsequent quitclaim

deed, although the quitclaim were first recorded. Assuming that the deed spoke the truth, and that Mallison, who represented both Callanan and the firm in this matter, also spoke the truth, they agreed to reconvey. It was then arranged that the Mullens should deed the·land back to Callanan by quitclaim deed, and that they should receive the money paid for it and about $300 additional for improvements made by them on the land. The quitclaim deed was accordingly executed on January 9, 1890, and filed for record January ·27, 1890, and the Mullens received the amount agreed to be paid. The Mullens then leased the land from Mallison some time in· February of the year 1890, for that season, paying $50 rental therefor.

One Brower was a local agent for Callanan and the firm, at Rockwell City, for the sale of Calhoun county lands, and in some way the Mullens learned that he had the property for sale, although they thought he (Brower) was representing Wiley. They went to Brower about buying the land in May of the year 1891, and after considerable negotiations they agreed to repurchase the lands for $11 and $11.50 per acre, upon condition that Brower would secure a loan for them upon the lands for $3,000. The loan was made and the balance of the consideration paid, and Callanan and wife again conveyed the land to plaintiff by warranty deed June 6, 1891. The consideration named in the deed was, according to the record, $3,780. On the 9th day of June, 1891, two deeds, each purporting to have been made by John Wiley and wife to James Callanan, each dated May 1, and acknowledged May 29, 1891, for the land in controversy, went upon the records; the expressed consideration being in the aggregate $3,840. The Mullens did not know of these deeds at the time they made the last deal, and did not know that their deed came from James Callanan until some five· years after its execution, for the reason that it was taken and retained by the mortgagee of the land and.held by him.for· five years, and until the mortgage indebtedness was extinguished. The abstract of title also

went to the mortgagee, and was also held by him with the deed. When the papers came into the possession of the Mullens, they then for the first time were informed that their deed came from Callanan, and that he, on the face of the papers, got his then title from Wiley.

As a matter of fact the original deed to Wiley was never delivered, and the reconveyances were made by him to Callanan simply to clear up the title. A significant fact in this connection is that, after the purported conveyance to Wiley, Callanan, on January 29, 1890, wrote advising Wiley that some time before he had conveyed the lands to him for reasons not necessary to be stated, and that as the deed had accomplished its purpose he wanted Wiley and wife to execute a deed in blank, which was inclosed, purporting to reconvey the property. This deed was evidently returned, but was not recorded, and, as negotiations were then pending for the resale of a part of the lands to the Mullens, he sent Wiley two deeds as a substitute for the previous one, in one of which plaintiff, Mullen, was named as grantee, and in the other he himself was the ostensible grantee. In the letter accompanying these latter deeds Callanan wrote Wiley:

As soon as I receive them, I will return you the old deed. This is all right. I did not want the party to know that I owned them. I told them the land belonged to you.

Wiley refused to comply with the request, and Callanan again wrote, urging compliance with the original suggestion. But this Wiley refused to do, although he and his wife did sign and return the two deeds, each of which named Callanan as grantee, which two deeds were recorded, as already stated, or the same day that the reconveyance to the plaintiff, Mullen, went on record. Callanan evidently forgot to return the first Wiley deed, and on August 4th, upon the suggestion of Wiley, Callanan returned the first deed, saying it had been forgotten, that he had never used it and had erased the name of grantors,

that it was all right, and no liability attached to Wiley on account thereof.

Plaintiff was not advised of the facts above stated, save as they participated therein, or of the alleged fraud, until Mr. Mullen, the husband, met the man Lawless, already referred to, in Des Moines shortly prior to the commencement of this suit. When the original conveyance was made, both Mr. and Mrs. Mullen believed that the deed to them was made in the form it was because it was claimed that Callanan held it under a tax title, and the firm as swamp lands. And they never knew until about the time this suit was brought that Callanan or any one else contended that he and he alone was the owner of the land, and that it was sold by mistake as Callanan & Savery's land. When the matter was brought to their attention and they were asked to reconvey, it was not primarily because of mistake as to whether the land belonged to Callanan, or to Callanan & Savery, but because, no matter which owned it, it had theretofore been conveyed by warranty deed to Wiley, and for this reason, and this alone, they asked and demanded a reconveyance of the land, upon a return of the consideration and the amount expended by the Mullens for improvements. To this claim they (Mullens), on advice of counsel, were forced to yield, and they never had the matter of claimed mistake in the ownership as between Callanan, and the firm, Callanan & Savery, presented to them, nor did Callanan ever rely upon such a claim. His statement in that regard was simply one of the premises to his real claim that the land had previously been sold to another. Callanan studiously concealed the facts regarding the nature of the conveyance to Wiley down to the time of his death, which occurred about September 26, 1904, and no one would have known it, it seems, but for the disclosures made by Lawless just prior to the bringing of this action. There was no reason why the Mullens should have questioned the Wiley deed. It was regular on its face, properly acknowledged and recorded,

and gave no information to any one that it was other than what it purported to be.

As already observed, Callanan to the last attempted to conceal the nature of the Wiley deed, and plaintiff did not know that the title stood in the name of Callanan until about the year 1896, and at that time the records showed a reconveyance of the lands by Wiley to Callanan in May of the year 1891, as already indicated. These reconveyances did not, in themselves, cast any suspicion upon the original deed from Callanan to Wiley, which had been dated back, but which on its face was duly acknowledged and recorded. Had Callanan claimed a mistake as to the ownership of the land at the time of the original conveyance to plaintiff—that is, that it belonged to him and not to his firm—plaintiff would have had a right to contest that proposition both as a matter of fact and as to its sufficiency as a matter of law for rescinding the sale. But in the way it was put, of a previous sale by warranty deed to a stranger, there was no other recourse for her than to rescind and receive back her money. Even when she found that Wiley had thereafter made a reconveyance of the land to Callanan, there was nothing in that fact alone which would create any suspicion that the original deed to him was not genuine, and that it was not signed and acknowledged upon the dates stated therein.

The nature of this suit has already been sufficiently stated, and from the facts heretofore recited, about which there is little dispute, it is apparent that while plaintiff now owns the land, having title thereto, it should in equity be decreed to be in plaintiff from the time of the original conveyance to her, and that she should have returned to her all amounts she has paid for the property over and above the amount agreed to be paid as the original purchase price, unless it be for some of the defenses pleaded by the defendants.

Among these defenses is a claim that plaintiff suffered no damage; that she has what she purchased; that the original

deed was of no validity, and could not have been upheld,
because of a mistake as to the ownership of
the land, and as to what was intended to be
conveyed; that if it had been purchased under
contract, and no deed had been made in fulfillment of the
original contract, an action for specific performance would
not have been sustained, and that, even if Callanan had com-
mitted no fraud, he could have had the original conveyance
set aside for mistake. The difficulty with these contentions
lies in the fact that Callanan at no time claimed the right to
rescind upon the ground of mistake. He selected his own
ground for getting rid of the conveyance, and was successful
in it, and, having taken advantage of that claim, he cannot now
rely upon another and inconsistent one. The original con-
veyance to plaintiff was an executed and not an executory
one, and it makes no difference now that plaintiff could not
have enforced it in equity. It was executed, and Callanan
undertook to get rid of it, and the effect of what he did was to
deprive plaintiff of a title which was good as against the
fraudulent claims made ostensibly on behalf of Wiley, but
really for himself.

1. CONVEYANCES: fraud: estop-pel: evidence: damages.

Again, the mistake as to just who owned the land was a
unilateral one, on the part of Callanan alone, and the deed
was sufficient to carry, not only his individual interest, but
also the interest of his firm in and to the land. Plaintiff had
no knowledge of any mistake on the part of Callanan, or of
Callanan & Savery, even if it be said that any mistake was
made. Plaintiff needed a conveyance which would transfer
the land to him, no matter whether title was based upon the
swamp land grant or the tax title; and, as a matter of fact,
when the original deal was made, Callanan did not have a
tax deed, but simply a certificate of sale. Mullen was in-
formed from some source that the land would not be redeemed,
and for this reason thought he should have a conveyance which
would cover the tax claim. But, as we have said, Callanan
did not at that time have a complete title through his tax

deed, and the land appeared both on his books and also upon the books of Callanan & Savery. We doubt very much whether Callanan could have rescinded the contract, or have had the deed set aside in a court of equity because of mistake.

But, however this may be, he did not attempt to do that, but, on the contrary, selected another ground, which, upon the face of it, was good, but which was conceived in fraud and covered with deceit. Having thus obtained a reconveyance, a court of equity will not permit him to entirely disregard his deceit and fraud on the theory that, if he had done something else, he might have secured the same results from the plaintiff. Plaintiff had the right to assume that Callanan was acting in good faith, and presenting truthful claims, and to govern herself accordingly; and, having succeeded in his schemes, a court of equity will not permit Callanan, now that he is brought to book, to entirely change his grounds and take a new hold, presenting in defense a claim which he never made when he asked a rescission of the contract and a reconveyance of the property. Had he made the claim which is now made and plaintiff had acceded thereto, of course, there would be no case. But having concealed the claim, and made another untruthful one, on which plaintiff acted, he must be deemed to have waived and estopped himself from presenting any other—as much so as if he had secured the results at the end of litigation with plaintiff over the same subject-matter.

We think this issue is a moot one, and that the claim of mistake in the original transaction cannot now be litigated. The conveyance must be treated as good, save for the claim, made by Callanan at the time, that the land had previously been conveyed by warranty deed to Wiley. Plaintiff was not bound, under any theory, to reconvey the land to Callanan. Had Callanan presented the matter of mistake now relied upon as a ground for rescission and a reconveyance, it was for plaintiff to say whether she would recognize it or not, and to litigate that claim, had she chosen to do so. Having put it upon another ground, and secured a reconveyance, that right passed.

from plaintiff, and, as already suggested, Callanan and his representatives are now estopped from putting their conduct upon some other ground. This disposes of the fundamental propositions made for appellants as to the real merits of their defense.

II. They rely largely upon the statute of limitations, claiming that the action should have been brought at law, and not in equity, and that, even if plaintiff had an election as to forum, the fraud was perpetrated either when plaintiff made the reconveyance or when the Wiley deed was placed of record, and that in any event the claim should have been filed against the estate within one year from the time notice of the executor's appointment was given. We are of opinion that, as the action is to set aside the conveyances from Callanan to Wiley, the deeds from Wiley to Callanan, and the second deed from Wiley to plaintiff, and to confirm plaintiff's title under the first deed, the action is one which was heretofore solely cognizable in a court of equity, and that, under Code, sections 3447, 3448, the statute did not begin to run until the fraud was actually discovered. *Caffee v. Berkley,* 141 Iowa, 344; *Cress v. Ivens,* 155 Iowa, 17, and cases cited; *McKay v. McCarthy,* 146 Iowa, 546.

2. SAME: limitation of actions: fraud: notice.

The recording of the Wiley conveyance did not, as we think, amount to notice of the fraud. *Piekenbrock v. Knoer,* 136 Iowa, 534.

As a part of the relief, plaintiff was entitled to claim damages, without converting the action into one at law.

But, conceding that it might have been brought either at law or in equity, or that a court of law alone had jurisdiction, still the action is not barred, because the cause thereof was deliberately concealed from plaintiff, and she had no notice of facts putting her upon inquiry which would have led to a discovery thereof until shortly before the commencement of this action, and it is not barred. *Boomer v. French,* 40 Iowa, 601; *Faust v. Hosford,* 119 Iowa, 97; *Cress v. Ivens,* 155 Iowa, 17; *Blakeney v. Wy-*

3. SAME.

*land,* 115 Iowa, 607; *Cook v. Railroad,* 81 Iowa, 551; *Carrier v. Railroad,* 79 Iowa, 80.

The doctrine of laches does not apply, and, even if it did, plaintiff proceeded with proper diligence after notice to her of the alleged fraud. *Byrnes v. Electric Co.,* 65 Conn. 336, (31 Atl. 833, 28 L. R. A. 304), and cases cited; *New England Co. v. Swain,* 100 Md. 558, (60 Atl. 469).

4. SAME: laches.

III. The contention that the claim should have been filed with the executors within one year after notice of their appointment is without merit. Plaintiff was not advised of it until long after the expiration of that time, and she brought this action within one year after she learned of the fraud and of her cause of action. True, she did not make a formal filing of the claim. But this was unnecessary. *Sterritt v. Robinson,* 17 Iowa, 61; *Cooley v. Smith,* 17 Iowa, 99; *McCrary v. Deming,* 38 Iowa, 527; *Crane v. Guthrie,* 47 Iowa, 542; *Moore v. McKinley,* 60 Iowa, 367; *Clough v. Ide,* 107 Iowa, 669.

5. SAME: limitation of actions.

Aside from this, the nature of the action is such that it could not be tried in probate. The executors were proper parties to the petition, it being as we have seen, an equitable one, to set aside conveyances, and there is no claim that they are not proper parties, or that other parties should have been brought into the case. The representatives of the estate were proper parties, because a judgment was asked for damages, and as the title to real estate was involved, or rather a cloud on the title was to be removed, the action was properly brought in equity.

6. SAME: jurisdiction: parties.

There was also a claim that the executors were trustees, and that for this reason the case was properly in equity. True, they were sought to be charged as such; but we need not decide as to whether or not the proofs sustain the allegations, for other grounds for equitable jurisdiction are shown.

IV. Another claim made for appellants is that plaintiff was not damaged; that she got back all she paid for the first

conveyance, and paid no more for the land than it was worth when she took the reconveyance. This view

**7. SAME: fraud: measure of damages.**

deprives her entirely of the benefits of her first bargain. If the first conveyance was good, and she was obliged by Callanan's fraud to relinquish it, and to repurchase at a greatly advanced price, she was defrauded of the difference paid, because she owned the land from the beginning and was entitled to the natural increase of value without paying for it. The testimony shows that there was a very rapid increase in values of the land in the interim between the two conveyances—as much, indeed, as $10 to $15 per acre. To the difference in price paid, with proper interest charges and credits, plaintiff was entitled, and this in addition to the other relief the court accorded her.

There is testimony tending to show that a deliberate fraud upon the plaintiff was intended from the beginning, but we need do no more to demonstrate that an actual fraud was perpetrated than to recite the practically undisputed facts as heretofore set out. Appellants' contention that, while a moral wrong was committed, there was no legal fraud, is not sound, either in law or in equity. We can hardly conceive of a more deliberate and reprehensible fraud than was here committed, and to say that it is not one of which equity will take cognizance is to affirm that a court of chancery is impotent and cannot exercise one of the powers for which it was created, to wit, to relieve against fraud and deceit.

The case has been ably argued, and we have gone over the record with great care, and find no reason for disturbing the decree in any respect.

Appellee's motion to assess a penalty for taking the appeal is overruled, but the decree below is—*Affirmed.*

LADD, C. J., and GAYNOR and WITHROW, JJ., concur.