### WILSON v. LE MOYNE.

(Circuit Court of Appeals, Fourth Circuit. March 6, 1913.)

No. 1,118.

1. LIMITATION OF ACTIONS (§ 100*)—FRAUD—DILIGENCE—ORDINARY DILIGENCE.

Code Pub. Gen. Laws Md. 1904, art. 57, limits an action for fraud to three years, and section 14 declares that, where a party has a cause of action of which he has been kept in ignorance by the fraud of the adverse party, the right to bring suit shall be deemed to have first accrued at the time at which such fraud shall, or with usual or ordinary diligence might, have been known or discovered. *Held* that, where plaintiff, believing that defendant held a particular outstanding title to certain large tracts of land in Virginia, purchased the same from defendant under a special warranty deed executed March 26, 1906, and though plaintiff's attorney was warned of facts that would have put an ordinarily prudent person on inquiry as to the validity of defendant's title, no inquiry or investigation thereof was made, by an examination of the records or otherwise, which would have fully shown the condition thereof, defendant, by an alleged statement that he owned such outstanding title, could not be said to have fraudulently prevented plaintiff's investi-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

gation thereof, so as to suspend limitations against plaintiff's right of action for fraud until he ascertained that defendant did not own the title in question, which plaintiff ascertained by an investigation first made in 1911.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 323, 480–493; Dec. Dig. § 100.*]

2. LIMITATION OF ACTIONS (§ 100*)—FRAUD—"ORDINARY DILIGENCE."

Code Pub. Gen. Laws Md. 1904, art. 57, § 14, provides that, where a party is kept in ignorance of the fraud of the adverse party, the right to sue shall be deemed to have first accrued when the fraud shall, or with usual or ordinary diligence might, have been known or discovered. *Held*, that "ordinary diligence," as so used, implies that something must be done in order to enable a person to avail himself of the provisions of the statute, and that where opportunity is afforded a party to discover the true facts, and he makes neither inquiry nor effort to do so, he is not entitled to relief thereunder.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 323, 480–493; Dec. Dig. § 100.*

For other definitions, see Words and Phrases, vol. 6, pp. 5043, 5044.]

McDowell, District Judge, dissenting.

In Error to the District Court of the United States for the District of Maryland, at Baltimore: John C. Rose, Judge.

Action by George B. Wilson against John V. Le Moyne. Judgment for defendant, and plaintiff's executor, George B. Wilson, Jr., brings error. Affirmed.

This is an action at law. The plaintiff in error was the plaintiff below. On March 26, 1906, John V. Le Moyne, a retired lawyer, then about 76 years old, executed and delivered at Baltimore, Md., in consideration of the payment to him of $14,000 cash, a deed releasing and quitting claim unto one George B. Wilson, with special warranty, all the right, title, and interest in two tracts of land lying in Wythe and Grayson counties, Va., conveyed to said Le Moyne by a deed of November 2, 1892, from Benjamin E. Green and wife and by deed of November 4, 1892, from David W. Armstrong; the premises conveyed in said deed from said Armstrong to the party of the first part being described as follows: "A tract of 33,000 acres granted to James Swan by the state of Virginia August 27, 1795, and a tract of 150,000 acres granted by the state of Virginia to George Lawman on July 13, 1796. At the time the deed above mentioned was made, Le Moyne delivered to Samuel J. Randall, the agent of Wilson, the two deeds therein mentioned. The deed from Armstrong to Le Moyne is a deed of special warranty, conveying the grantor's right, title, and interest in the above-mentioned two tracts of land. It contains no recitals or other indication of the source of title in Armstrong. In his testimony Le Moyne said that he had paid Armstrong about $5,000 for this conveyance and the conveyance from Green, which was obtained by Armstrong. In the deed from Le Moyne to Wilson, it is said that this deed from Armstrong was duly filed for record in Wythe county, Va., in 1892, and in Grayson county in 1893.

The deed from Green and wife to Le Moyne reads as follows: "Whereas, Darius B. Holbrook and Elizabeth T. Holbrook, his wife, did, by a certain deed dated and executed on the 20th day of August, 1855, convey to the said Benjamin E. Green and to Othniel De Forest, and to the survivor of them, as trustees for the Virginia and Kentucky real estate trust fund, a large quantity of lands, aggregating some 2,552,304 acres, situated in the aforesaid states of Virginia and Kentucky, and being the lands which had been conveyed by James Swan, of Massachusetts, to Samuel Allison, of Philadelphia, by a deed dated August 30, 1830; and whereas, by reason of the great lapse of time, the condition of the said lands, and other impediments, it has been

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

heretofore impracticable to carry said trust into beneficial effect, and the said real estate trust fund is largely indebted to said Benjamin E. Green for services rendered and money advanced; and whereas, in consequence of the death of the said Othniel De Forest, the said Benjamin E. Green has become and is the sole survivor of the trustees nominated in the said deed, and as such survivor vested with the legal title in and to the lands conveyed by the said deed; and whereas, in consequence of the death of said Darius B. Holbrook and his wife, and in pursuance of the terms of his will, all the right, title, and interest of the said Holbrook in and to the said lands passed to and became vested in his daughter, Caroline E. Von Roques, and in trustees for her benefit; and whereas, in pursuance of certain deeds and contracts executed by the said Caroline E. Von Roques and her husband, and by the trustees under the aforesaid will of Holbrook, all the right, title, and interest of the said Holbrook has been conveyed to the said John V. Le Moyne, party of the second part herein: Now, in consideration of the premises, and of the sum of one dollar cash in hand paid to them, the said parties of the first part do hereby grant, convey, remise, release, and quitclaim unto the party of the second part, his heirs and assigns, forever, all the right, title, and interest of whatsoever kind that may be vested in them, the said parties of the first part, and in the said Benjamin E. Green, as trustee or otherwise, in and to the lands aforesaid in the said state of Virginia, or in West Virginia, and in and to each and every tract, parcel, and piece thereof, to have and to hold the same unto the said party of the second part, his heirs and assigns, forever. And the said parties of the first part will forever warrant and defend the title to the said lands against the claims of any and all persons claiming by, through, or under them, or either of them, and against the claims of no other person whatsoever."

According to the recitals in the deed from Le Moyne to Wilson, this deed from Green to Le Moyne was filed for record in Wythe and Grayson counties at the same time that the Armstrong deed was filed. So far as the record shows, these deeds from Armstrong and Green were the only muniments of title that Le Moyne had or that he had ever seen. Some time prior to 1906 Mr. Samul J. Randall, a lawyer living in Philadelphia, who had been employed by certain creditors of the so-called Swan estate, was informed that Le Moyne claimed some interest under the "Allison title" in the two abovementioned large tracts of land in Virginia, which were also claimed by the Swan estate. With knowledge that there were in existence several conflicting claims to these lands, Randall in January, 1906, went to Baltimore, where Le Moyne lived, to ascertain if he could prevail upon him in an effort to vest in some trustee for the common benefit all of the claims of title derived or claimed to be derived from Swan to the lands in question. Le Moyne refused to become a party to Randall's plan, and shortly thereafter, Randall, acting for George B. Wilson, a retired real estate dealer of Philadelphia, proposed to Le Moyne that he sell his interest in the lands to Wilson. After some negotiation and haggling, a sale at the price of $14,000 cash was made, and the deed of March 26, 1906, from Le Moyne to Wilson, supra, was executed and delivered.

In May, 1911, Wilson brought this action (tendering with the declaration a reconveyance to Le Moyne) to recover the purchase money and interest, on the ground that the purchase had been induced by fraudulent misrepresentations by Le Moyne as to his title to the lands conveyed. Later an amended declaration was filed, in which the allegations as to fraud are confined to a charge that Le Moyne falsely represented that he owned the "Allison title" to the lands in question. Pleas of general issue and of the three-year statute of limitation were filed. Plaintiff thereupon, replying generally to the tender of general issue and to the plea of limitations, declared "that he did not, by reason of defendant's fraudulent concealment, discover defendant's fraud and misrepresentations until within three years before the commencement of this suit." The defendant filed a rejoinder, denying the truth of the replication as to the alleged fraudulent concealment by the defendant. Upon the conclusion of the testimony the trial court, after refusing a prayer by the defendant for an instruction that there had been no sufficient evidence of fraud by

the defendant, granted an instruction as follows: "The court instructs the jury that there is in this case no legally sufficient evidence that the plaintiff had been kept in ignorance of the alleged deceit by the fraud of the defendant until within three years of the bringing of this suit, and their verdict must be for the defendant." Verdict having been accordingly rendered for the defendant, judgment was entered, and the plaintiff below sued out his writ of error, which is now prosecuted by his executor.

At this point it should be said that the so-called "Allison title" (as appears from the recitals in a deed from Darius B. Holbrook and wife to Green and De Forest, trustees) is a claim derived by deed of 1830 from James Swan to Samuel Allison, subsequently conveyed by deed of 1838 from Allison to Darius B. Holbrook. Evidence offered by the plaintiff tended to show that the trustees of the Swan estate had at least some semblance of title under Swan, supposed to have been created by act of the Virginia Legislature, which conflicted with the Allison title: that the trust created by the above-mentioned deed from Holbrook to Green and De Forest had failed; that Green had no power, after the death of De Forest, to convey; that Holbrook's title passed by his will to his wife and to his daughter, Caroline E. Von Roques; and that the conveyance from Armstrong was invalid. The testimony on this last point consisted of a statement by Randall that, when in 1911 an investigation was made, no deed from any one to Armstrong was found of record in either Wythe or Grayson counties, and of the following:

"Plaintiff offered in evidence, as Exhibit No. 4, a certified copy of a decree of the chancery court of the city of Richmond, Va., in the suit of Caroline E. Von Roques against David W. Armstrong, Harrison T. Groom, and others, dated February 3, 1909. Said decree set aside the conveyance of Caroline E. Von Roques, Florence E. Maybrick, and the trustees to Harrison T. Groom of certain lands, including the lands mentioned in the plaintiff's declaration, decreeing that the said Groom in said transactions was acting as a trustee for David W. Armstrong, one of the said defendants, who, at the time of said conveyance and long prior thereto, had been the attorney for said Caroline E. Von Roques, and further decreeing that Hill Montague, a commissioner of said court, should make and execute a conveyance to the said Caroline E. Von Roques and certain trustees of all lands lying in the state of Virginia, including the lands described in plaintiff's declaration, conveyed by said parties and others to the said Groom. Plaintiff offered in evidence, as Exhibit No. 5, a duly certified copy of the last will and testament of Darius Blake Holbrook, probated in New York City, New York. Said will devised and bequeathed one-half of his estate to his wife, Elizabeth Thurston Holbrook, in fee, and the other half to Frederick G. Thurston, William Read Holbrook, and Elizabeth Thurston Holbrook, in trust for his daughter, Caroline E. Von Roques. A duly certified copy of the deed of Hill Montague, conveying the property in controversy in these proceedings, amongst others, to Caroline E. Von Roques and certain trustees pursuant to the decree of the chancery court of the city of Richmond, referred to in 'Plaintiff's Exhibit No. 4,' was offered in evidence as 'Plaintiff's Exhibit No. 6.'"

It does not appear from the record whether or not Le Moyne had actual knowledge of the defect in his title. In the amended declaration it is alleged that Wilson discovered the falsity of Le Moyne's statements in July, 1910. In Randall's testimony it is said that it was early in 1911, from information acquired by him in Richmond, Va., that suspicion arose and that investigation was made.

The evidence on the question of the alleged fraudulent representation by Le Moyne to Randall need not be set out in full. Le Moyne denied that he had ever said that he had the Allison title, or that he had made any representations whatever as to his title. The correspondence between Randall and Le Moyne and between Wilson and Le Moyne, all of which antedated the delivery of the deed to Wilson, tends to support Le Moyne's testimony. Le Moyne also testified that he wrote to Randall in January, 1906, that the first step in the matter should be an examination of the records. But Randall denied having received any such letter. Randall also testified that "Mr. Le Moyne told him upon three different occasions that he owned the Allison

title; three different and separate occasions; that the last time was when the title passed." Again witness' statement is: "Witness said to Mr. Le Moyne: 'Mr. Le Moyne, I have gotten Mr. Wilson to buy this title, this Allison title; but before I deliver this money to you I want to know whether you own this Allison title,' and he told me as far as he knew he owned that Allison title." This statement is alleged to have been made just before Randall delivered the check for the purchase money to Le Moyne. One other witness, Randall's clerk, testified that he was with Randall when the deed was delivered, and that at that time "Mr. Randall asked Mr. Le Moyne, 'Is this the Allison title?' as other titles would be no good to him, and he said, 'Yes, this is the title.' "

There was no evidence that Le Moyne had any further dealings or communications with either Wilson or Randall after the delivery of the deed to Randall on March 26, 1906, or that he ever did or said anything to prevent an investigation of the truth of his alleged statements as to his ownership of the Allison title. There was evidence for the plaintiff to the effect that neither Wilson nor Randall learned of the defect in Le Moyne's title until 1911. So far as appears, no examination of title was made, and no effort of any sort was made to investigate the truth of Le Moyne's alleged statement, until some time in 1911. It also appears that Wilson never met Le Moyne, and that Randall made such slight acquaintance as he had with him only a few months before the purchase was made.

Samuel V. Hayden, of Washington, D. C., for plaintiff in error. W. Irvine Cross, of Baltimore, Md., for defendant in error.

Before PRITCHARD, Circuit Judge, and WADDILL and Mc-DOWELL, District Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). [1] The first assignment of error is to the effect that the court erred in granting defendant's second prayer, which is in the following language:

"The court instructs the jury that there is not in this case legally sufficient evidence that the plaintiff had been kept in ignorance of the alleged deceit until within three years from the beginning of this suit, and that verdict must be for the defendant."

The law of Maryland as respects this question is to be found in the Code of Public General Laws of Maryland (article 57, § 14):

"In all cases where a party has a cause of action of which he has been kept in ignorance by the fraud of the adverse party, the right to bring suit shall be deemed to have first accrued at the time at which such fraud shall or with usual or ordinary diligence might have been known or discovered."

Under the provisions of the Maryland statute of limitation, one who fails to bring his suit within three years from the time his cause of action accrues is precluded thereby, unless he can bring himself within the exception contained in the foregoing statute by showing that he has exercised ordinary diligence to discover the fraud of which he complains. Therefore the burden is upon him to show that he has exercised ordinary diligence before he can avail himself of the provisions of this statute.

It is insisted by counsel for plaintiff that the court below should have submitted to the jury the question whether the failure of plaintiff's decedent to discover his cause of action until within three years of the bringing of this suit was due to failure on his part to use due

diligence, or to the fact that the defendant so concealed the wrong that he was unable to discover it by the exercise of ordinary diligence. In order that we may reach a correct determination of this point, it becomes necessary to consider the facts surrounding the transaction at the time that Le Moyne parted with such title as he may have had to these lands.

At the beginning of the negotiations leading up to the conveyance of the lands in question to Wilson, Samuel J. Randall, a witness for the plaintiff, testified that:

"In 1904 he was employed by the Randall creditors of the Swan estate, and as attorney for these creditors he came in contact with Mr. Henry McCarthy, of Philadelphia, who was trustee of that estate. He called upon Mr. Mc-Carthy one day, and he informed him that there were two tracts of land, situated in Grayson and Wythe counties, in the state of Virginia, consisting of 150,000 acres and 33,000 acres; that those two tracts of land in his estimation were valuable, if they could combine the various conflicting senior grants. He then saw him the second time, and he informed him [witness] that, as far as the Swans were concerned, he as trustee would go into any combination to bring these titles together. He also informed witness that he could probably get in contact with the owner of the Allison title by communicating with Mr. Hawes, of New York, a member of the New York bar. The witness went to New York and saw Mr. Hawes; saw him upon two occasions. He told witness that Mr. Le Moyne, of Baltimore, the defendant in this action, was the owner of the Allison title."

Thus it will be seen, as the statement of facts shows, that Wilson, through his counsel, was exceedingly anxious to secure any outstanding titles which might strengthen or perfect the title to which Randall referred, and it was with this object in view that he approached Le Moyne and entered into negotiations for the purchase of the title which he held. That there was doubt in the minds of the parties as to who had the legal title is evidenced by letter from Randall to Le Moyne of January 17th, about two months before the purchase by plaintiff's decedent, in which Randall was endeavoring to induce Le Moyne to agree to the consolidation of the Virginia lands, in order that there might be a sale thereof for the benefit of all parties concerned. This was the situation at the time Le Moyne executed the deed for the land in question.

It is insisted by counsel for plaintiff that, where one practices a fraud for the purpose of keeping the injured party in ignorance of his cause of action, such party is kept in ignorance "by fraud of the adverse party." Thus we are confronted with the question as to whether the fraud complained of in this instance was of such a character, or so concealed, as to keep plaintiff in ignorance of same, or, in other words, if fraud was practiced in this instance, was it of such a character that by ordinary diligence it might have been known or discovered.

In the case of Stieff Company v. Ullrich, 110 Md. 634, 73 Atl. 874, the facts are somewhat like those of the case at bar. A man named Lauritzen borrowed $2,000 from a company of which he was employed to purchase a house. At the time he borrowed the money, he stated that he did not want to put a mortgage on his house, but would take it in his own name, so that it would be a security for the

debt. Instead of taking it in his own name, he took it in the name of himself and wife as tenants by the entireties. Lauritzen died, and shortly after him his wife died, and the property was sold by her administrator. When he was about to distribute the proceeds, a bill was filed by the company from which Lauritzen had borrowed the money to enjoin a distribution of the fund until the adjustment of the company's claim. More than three years had passed since Lauritzen had had the deed to himself and wife recorded. It was contended by the company that the taking of the deed by Lauritzen in the name of himself and wife as tenants by the entireties had been a fraud, and that the company did not discover it until within three years of the bringing of the suit, and that limitations should not begin to run until such discovery. The court said:

"But it is contended by the appellant that it did not discover the fact that the deeds had been given to Lauritzen and wife, as tenants by the entireties, until about the time of the death of the former, in June, 1908, and that limitations should not begin to run until such discovery at that time. In the case of Wear v. Skinner, 46 Md. 257 [24 Am. Rep. 517], a leading one on this subject, it is said that 'when a party has been injured by the fraud of another, and such fraud is concealed, or is of such character as to conceal itself, whereby the injured party remains in ignorance of it without any fault or want of diligence on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.' The facts in this case show that the appellant, who, as president of a large business enterprise, must be regarded as a person of intelligence, did not exercise the diligence or prudence usually observed in a transaction of such importance. He gave a check for the money and took the note as security for the same, relying upon the promise of Lauritzen to have the deed made in his own name. There was a clear breach of confidence on the part of Lauritzen, but he took no pains to conceal it. He did not keep the deed from record. The money was loaned January 28, 1904; the deed was recorded about three weeks later, on February 19th, following. Ordinary diligence on the part of the appellant would have caused him to look at the records, or have the deed submitted to him before it was recorded, to see that his interests were properly protected in the manner he desired. It seems to us a case of inexcusable neglect on his part. The defense of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove. Hence the tendency of courts in recent years has been to hold the plaintiff to rigid compliance with the law, which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts.' Phelps' Judicial Equity, § 265; Foster v. Railroad, 146 U. S. 88 [13 Sup. Ct. 28, 36 L. Ed. 899]; 16 Cyc. 171 et seq."

It is insisted by counsel for plaintiff that the case of Wear v. Skinner, supra, is controlling here. We do not think so. The facts in that case are different, and for the purpose of this case we are content to base our ruling upon the more recent decisions of that state, especially the one which we have just quoted.

Also in the case of Reeder v. Lanahan, 111 Md. 372, 74 Atl. 575, it appears that a bill was filed against Samuel J. Lanahan, who had been his surviving partner and his trustee. It had been 30 years since Samuel J. Lanahan had settled up his accounts as trustee. The executors and heirs had been familiar with the settlement of William

Lanahan's estate, including the trust in the hands of Samuel J. Lanahan. Samuel J. Lanahan pleaded want of equity, limitations, and laches. To avoid the limitations the plaintiff set up the statute which is invoked here, alleging that Samuel J. Lanahan had concealed all knowledge of his failure to fully account to the plaintiffs and other parties interested. In that case the court said:

"The defendants seek to avoid the defense of limitations upon the ground that Samuel J. Lanahan concealed all knowledge of his failure to fully account, not only from the complainants, but from all other parties interested. It is somewhat difficult to perceive how it can be said that he concealed anything from persons who were not then in existence, or how the mere allegation of concealment can affect the legal results which flow from the facts disclosed by the record upon which the suit rests. The law requires suits of this nature to be brought within three years from the time the cause of action accrues, and 'where a party has a cause of action of which he has been kept in ignorance by the fraud of the adverse party, the right to bring suit shall be deemed to have first accrued at the time at which such fraud shall, or with usual or ordinary diligence might, have been known, or discovered. Acts 1868, c. 357; Code 1904, art. 75, § 14.' If it be true that Samuel J. Lanahan were guilty of the fraudulent concealment alleged, and that the trustees knew, or by the exercise of ordinary diligence might have known, or discovered it, the bar of the statute is not removed, because it is well settled that such knowledge or want of ordinary diligence on the part of the trustee is imputed to the plaintiffs. Crook v. Glenn, 30 Md. 55."

In the case of Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807, the Supreme Court, in construing the statute of Indiana, which provides that "an action for relief shall be commenced within six years after the cause of action accrued, and not afterwards," and that "* * * if any person liable to an action shall conceal the fact from the person entitled thereto, the action may be commenced at any time within the period of limitation after the discovery of the case of said cause of action," said:

"Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar. The bane and antidote go together. The provision in the statute of which the plaintiff seeks to avail himself was originally established in equity, and has since been made applicable in trials at law. There is no trace of it in the English statute of limitations of the 21st of James I, which was adopted in most of the American colonies before the Revolution, and has since been the foundation of nearly all of the like legislation in this country. Having been imported from equity, the adjudications of equitable and legal tribunals upon the subject are alike entitled to consideration. Upon looking carefully into the reply, we find it sets forth that the concealment touching the cause of action was effected by the defendant by means of the several frauds and falsehoods averred more at length in the complaint. The former is only a brief epitome of the latter. There is the same generality of statement and denunciation and the same absence of specific details in both. No point in the complaint is omitted in the reply, but no new light is thrown in which tends to show the relation of cause and effect, or, in other words, that the protracted concealment which is admitted necessarily followed from the facts and circumstances which are said to have produced it. It will be observed also that there is no averment

that, during the long period over which the transactions referred to extended, the plaintiff ever made or caused to be made the slightest inquiry in relation to either of them. The judgments confessed were of record, and he knew it. It could not have been difficult to ascertain, if the facts were so, that they were shams. The conveyances to Alvin and Keller were also on record in the proper offices. If they were in trust for the defendants, as alleged, proper diligence could not have failed to find a clew in every case that would have led to evidence not to be resisted. With the strongest motives to action, the plaintiff was supine. If underlying frauds existed, as he alleges, he did nothing to unearth them. It was his duty to make the effort."

Also in the case of Redd v. Brun, 157 Fed. 190, 84 C. C. A. 638, in construing section 2911 of the Colorado statute, which requires "bills for relief on the ground of fraud to be filed within three years after discovery of the facts constituting the fund, bars such suits three years after the discovery of facts which would awaken a person of ordinary prudence to an inquiry, which, if pursued with reasonable diligence, would lead to a discovery of the fraud," the court said:

"In the face of this statute, reasonable diligence required that the complainant, who suspected conveyances of real estate would be made or procured by Tillett for the purpose of concealing his property and defrauding his creditors, should examine the public records in his name, which would be likely to disclose and which did disclose such conveyances, at least once in three years. He failed to make this search, and to inquire among Tillett's neighbors and friends, so as to ascertain his relationship to Mrs. Stortes, until the statutory time had passed. The burden was upon him in this suit to show some sound reason why he did not make this search and inquiry in less than four years after the means of discovering the fraud were within his reach, and why a court of equity should refuse to apply its doctrine of laches until more than two years after the statutory limitation upon a like action had expired. He did not successfully bear this burden. He failed to establish any reasonable excuse for his postponement of his inquiry and search for more than four years after these deeds had been recorded. If by a failure to make the search and inquiry after the public record disclosed the means of discovery he could toll the limitation of the statute two years beyond the statutory time, it is not perceived why by a continued failure he might not toll it indefinitely; and as no equitable reason has been shown why the doctrine of laches should not be applied after the expiration of the limitation, the complainant has no standing in equity."

In this case it should be borne in mind that the purchaser was not engaged in buying lands, but simply speculating in land titles; that is to say, he was endeavoring to purchase any and all outstanding titles in order to perfect that which was not otherwise a legal title to the lands in controversy. Under these circumstances it is fair to assume that he was aware of the fact that, as a prudent man, it was his duty to scrutinize the title that he was purchasing, and if possible to trace the title in question to its original source with the view of determining its validity. The alleged representation made by Le Moyne to plaintiff's decedent was such that he could have ascertained the truthfulness of the same, if he had exercised anything like ordinary diligence. The deeds upon which which Le Boyne relied as muniments of title were of record and could have been examined at any time, had the purchaser exercised the diligence of a prudent man under similar circumstances. There is not a scintilla of evidence tending to show that Le Moyne did or said anything after he made the conveyance that could

be construed as an attempt on his part to conceal anything connected with the transaction.

If the contention of counsel for plaintiff as to the proper construction of this statute be true, one could purchase a tract of land, and file the deeds away in his safe, and keep them there for 50 years, and if, at the end of that time, an investigation should show that a fraud had been practiced upon him by the party from whom he purchased, he could institute a suit of this character, and have as his only excuse therefor that the fraud practiced was such as to conceal itself. It was evidently the purpose of the Legislature in the enactment of this statute that, in cases where a fraud was of such character as to conceal itself, or where the offending party by his own acts kept it concealed, to afford relief provided it should appear that the injured party had in the meantime exercised ordinary diligence in endeavoring to ascertain the true facts. It must be that the Legislature in using the proviso, to wit, " * * * at the time at which such fraud shall or with the use of ordinary diligence might have been known or discovered," intended to impose upon one who seeks to avail himself of this statute the duty to make some effort, to say the least of it, to ascertain the facts upon which he relies to relieve him from the provisions of the statute of limitations. It certainly could not have been the intention of the Legislature to relieve one who comes into court and claims that the fraud has been concealed, and that he could not have discovered it sooner in the face of the fact that he has had in his possession all the time papers which afforded him ample means of examining the record and ascertaining the truth about the matter.

It is a matter of common knowledge that there are more or less defects in the land titles of this country, and under these circumstances a man of ordinary prudence usually requires an abstract of title of the land purposed to be purchased. While this may not be true in every instance, yet where one without investigation takes title to a tract of land, but makes no effort whatever to ascertain whether he has obtained a good title, and rests content and does not bring his suit within the statutory period, he cannot be heard to say that he has exercised ordinary diligence to discover any fraud which may have been practiced upon him.

[2] The employment of the words "ordinary diligence" in the statute implies that something must be done in order to enable one to avail himself of the provisions of the statute. In the case of Stieff v. Ullrich, supra, the court, among other things, said:

"Ordinary diligence on the part of the appellant would have caused him to look at the records or have the deed submitted to him before it was recorded, to see that his interests were properly protected in the manner he desired."

In this instance the purchaser had the same opportunity that was afforded the party in that case to discover the true facts; but he did not make a single inquiry, and so far as the record shows made no effort whatever to ascertain the true condition of the title which he had purchased. After due consideration of the facts surrounding

this transaction, we fail to find any evidence tending to show that plaintiff's decedent exercised ordinary diligence to discover the alleged fraud. In the case of New England Insurance Company v. Swain, 100 Md. 558, 60 Atl. 469, the court, in discussing the Maryland practice, among other things said:

"Under our practice, if there be a total absence of evidence to establish such facts in favor of the plaintiff, suing after the period fixed by the statute of limitations, the court can so determine, as will be seen by reference to Cummings v. Bannon and Wear v. Skinner, supra."

If there had been any evidence tending to show that the plaintiff *had used ordinary diligence,* or that the wrong was so concealed that he could not have discovered it, then, there would have been a question to be passed upon by the jury, to wit, as to whether he had exercised ordinary diligence; but, as we have stated, there is a total absence of evidence tending to establish this fact, and we are therefore of the opinion that the action of the lower court in refusing to submit this question to the jury was proper.

Counsel for defendants relied upon the case of New England Insurance Company v. Swain, 100 Md. 558, 60 Atl. 469. We have carefully considered that case, and are of the opinion that it does not apply to the case at bar. There the court submitted to the jury the question whether or not the action of the agent could be charged to the company, and, if so, whether the failure of the company to return the premium had not been such as to prevent him from ascertaining at an earlier date that a fraud had been practiced upon him. The plaintiff in that case did not have the means by which he could ascertain the true facts, because the books and papers relating to the transaction were in the possession of the insurance company.

There was an element of subsequent concealment in that case; but, in view of the facts and circumstances surrounding this case, subsequent concealment cannot be considered as an issue in this controversy.

For the reasons stated, the judgment of the lower court is affirmed. Affirmed.

McDOWELL, District Judge, dissents.