**PARR et al. v. INSURANCE CO. OF NORTH AMERICA (two cases).**

**DONNELLY et al. v. SAME.**
**Nos. 3888–3890.**

District Court, D. Maryland.
July 1, 1929, and Nov. 9, 1929.

568

W. Calvin Chestnut, of Baltimore, Md. (Haman, Cook, Chestnut & Marrell, of Baltimore, Md.), for plaintiffs.

John Henry Lewin and Alexander Armstrong, both of Baltimore, Md. (Armstrong, Machen & Allen, of Baltimore, Md., on the brief), for defendant.

Opinion in Overruling the Demurrers.

WILLIAM C. COLEMAN, District Judge.

The question presented, which is the same in each of the three suits, is one of interpretation of section 14 of article 57 of the Maryland Code, which is as follows: "In all actions where a party has a cause of action of which he has been kept in ignorance by the fraud of the adverse party, the right to bring suit shall be deemed to have first accrued at the time at which such fraud shall or with usual or ordinary diligence might have been known or discovered."

Each of the three suits is based upon the same contract between the defendant and the plaintiffs whereunder the plaintiffs acted as policy-writing agents for the defendant. This contract provided for the rate of payment of certain commissions, both fixed and contingent, to the plaintiffs, the clause governing the contingent commissions being as follows (paragraph 7): "It is further agreed that should a larger contingent commission than 5% be granted to agents in any other large city, then in that case the Baltimore agents (the plaintiffs) are to receive the same amount of contingent commission." The declarations allege, and it is admitted, that the defendant company paid a larger commission, namely 10 per cent., to its Boston agents during some twelve years while the contracts were in force but that plaintiffs were never paid more than 5 per cent. The present suits, instituted in the state court in February, 1919, and brought here by removal, represent, therefore, claims for the additional 5 per cent. for the years during which the Boston agents were paid the 10 per cent. All of these additional commissions now in dispute are computed upon business done more than three years prior to the institution of the suits. Defendant has pleaded the Maryland three-year statute of limitations in each case, except as to a part of the claim in the third suit, which is admitted not to be barred, and plaintiffs, by way of replication, have invoked the provision of the Maryland Code above quoted, to which replication in each case the defendant has demurred.

In order that the issue thus defined by the pleadings may be clearly understood, it is proper to set forth in full the stated grounds of plaintiffs' replication which are as follows:

"And for replication to the defendant's fifth plea the plaintiffs say that they were ignorant of their right of action to bring this suit until a comparatively short time (and within three years) prior to the institution of said suit, and that they were kept in ignorance thereof by what in law amounts to the fraud of the defendant, in that

"(a) The relation of the parties as principal and agent were of a fiduciary nature implying mutual trust and confidence;

"(b) It was the duty of the defendant under the Agency Agreement to properly prepare an annual statement which should affirmatively and correctly show the amount of contingent commissions to which the plaintiffs were entitled under the agreement, and the defendant did annually prepare and furnish to the plaintiffs a statement which, on its face, represented that the plaintiffs were entitled to only 5 per cent;

"(c) That the fact that the defendant was granting and paying to its Boston agents ten per cent contingent commission was not known to nor suspected by the plaintiffs, but was peculiarly within the private knowledge of the defendant.

"(d) That the plaintiffs not knowing in fact who were the Boston agents of the defendant or the amount of contingent commission paid to them, and having no suspicion of the correctness of the defendant's annual statements exercised ordinary and usual diligence in accepting the statements of the defendant as true and correct."

The demurrer in addition to the common grounds of insufficiency in and conclusions of law, and of duplicity, alleges (a) that the replication does not show when or how the plaintiffs discovered the facts alleged to amount as a conclusion of law to fraud; and (b) that it sets forth matter cognizable only in a court of equity.

Summarized, the object of the Maryland statute here in question is to postpone the running of limitations—where (1) the plaintiff has been kept in ignorance by the fraud of the adverse party, and (2) has exercised usual or ordinary diligence to discover the fraud—until plaintiff obtains knowledge of it. The gist of defendant's contention that this statute cannot be availed of in the present action is (1) there is no allegation of that kind of fraud commonly cognizable in a court of law; that is, that there must be fraud in fact—deliberate or intentional deceit—as opposed to fraud in law consisting merely of failure to disclose to the plaintiffs their cause of action. And (2) that even if actual fraud be not a prerequisite, plaintiffs are barred because the statute's requirement of "usual or ordinary diligence" imposed an affirmative duty upon the plaintiffs to inquire regarding the commissions paid elsewhere, which they did not do.

 The construction to be given this Maryland statute is that adopted by the highest court of the state. Elmendorf v. Taylor, 10 Wheat. 152, 6 L. Ed. 289; Kansas City Structural Steel Co. v. Arkansas, 269 U. S. 148, 46 S. Ct. 59, 70 L. Ed. 204. From an examination of the decisions of the Court of Appeals of Maryland construing this statute, we find the following propositions to be established: First, the statute was passed for the purpose of enabling parties to set up the fraud of the defendant in a court of law, just as in a court of equity, for the purpose of removing the bar of limitations, which, prior to the statute, was not permissible in Maryland. Wear v. Skinner, 46 Md. 257, 24 Am. Rep. 517. See also State v. Henderson, 54 Md. 332; New England Co. v. Swain, 100 Md. 558, 60 A. 469. Second, in equity suits, fraud of the type involved in the present cases is within the contemplation of the statute. Peoples v. Ault, 128 Md. 401, 97 A. 711; Anderson v. Watson, 141 Md. 217, 118 A. 569. In the first of these latter cases, the basis of the bill was a contract of employment providing that not only should the plaintiff employee receive a certain sum monthly as wages, but that in addition, he should receive 10 per cent. of the net profits, if any from each of the employer's construction contracts. The contractor reduced the net profits by illegal expenditures which he concealed from the employee. In affirming a decree of the lower court allowing recovery by the employee, the Court of Appeals said, page 405 of 128 Md., 97 A. 711, 712:

"As to the plea of the statute of limitations and the bar of the settlement made in January 1908, it is sufficient to say that, if the appellee was entitled to more than was paid him at that time by reason of the net profits being reduced by expenditures the illegality of which fact was concealed from him by the appellant, the statute operates only from the time such fraud was discovered, or could have been discovered by due diligence. Section 14, art. 57, of the Code. Under the facts in the record we are of the opinion that the appellee had no knowledge of what these extra expenses were for, and was led to accept them in making his settlement as correct by reason of his implicit confidence in the integrity of his employer."

In the second case, in granting as accounting for wages due by a coal mining company to its employees, based on the use by the company of inaccurate scales for weighing coal, the court said, pages 228, 229 of 141 Md., 118 A. 569, 573:

"We cannot assume, as we are asked to do by the coal company's demurrer, that for 15 years that company continuously withheld from its employees, without their knowledge or consent, by means of false weights, agencies, and instrumentalities in its exclusive control, compensation justly due them, to its gain and their loss, without assuming also that it knew and intended to do what it did. On the other hand, in the face of their statements that they knew nothing of the short weight, and considering the fact that the conditions resulting in the false weights were so latent as to deceive even the officials charged with the duty of inspecting such scales for the state, we cannot assume that the employees of the coal company were guilty of negligence in failing to discover the false weights. We cannot say under such circumstances that the company had no knowledge of the false weights nor that it had no intention to deceive. Knowledge and intent are mental phenomena which in the case of a corporation can only be inferred from the acts of its agents. It seldom happens that a person, natural or corporate, overtly admits or declares, either orally or in writing, an intention to perpetrate a fraud, and it follows that the existence of such an intent can, in many cases, only be known from inferences drawn from the conduct of its agents.

"*It is not necessary, in establishing the knowledge and intent essential to a charge of fraud, to show such knowledge and intent by direct evidence, but they may be inferred from the conduct of the parties (Sisk v. Garey, 27 Md. 417), and if we assume that the*

company, over a long period of years, intentionally deprived and withheld from the plaintiffs, without their knowledge; compensation justly due them, under the circumstances of this case fraud may be inferred from such conduct on its part." (Italics inserted.)

We are unable to distinguish these cases from those now under consideration. The criminality of what was done by the employer in the first of these cases has been argued as a distinction. We disagree, because fraud with respect to the rightful beneficiary of funds is not determined by the character of the misappropriation. It is true that there appears to be no decision of the Court of Appeals of Maryland involving an action at law in which article 57, section 14 of the Maryland Code was sought to be invoked under circumstances parallel to those existing here or in the two equity suits just analyzed, but we see no basis for making a distinction since the statute itself expressly removed, without apparent qualification, the common-law inhibition against pleading fraud in law actions. The ground on which the present suits is brought is an agreement between a principal and his agent whereby the agent is entitled to a profit sharing basis of compensation. Paragraph 1 of the agreement made it incumbent upon the defendant to prepare the annual accounts, showing the amount of contingent commissions due the agent. The replication alleges this duty and a breach of it, in that the defendant has not furnished a true account, and that the plaintiffs, by reason of the fiduciary relationship between them and the defendant, had a right to assume that such statements as were rendered were complete and accurate and to rely upon them without further inquiry, the fact that the higher commissions had been paid to the Boston agents not being one of general knowledge, but of knowledge peculiar to the defendant. It is, of course, true that mere ignorance of the facts which constitute a cause of action will not postpone the running of the statute of limitations. For example, as was said in State v. Henderson, 54 Md. 332, at page 342: "The statute could not have intended that the bare omission on the part of a debtor to remind his creditor of his cause of action against him should be regarded as fraudulently intended to keep him in ignorance of his claim." But we have been referred to no decision refusing the right to invoke the statute where, as here, the knowledge of the facts of which a plaintiff was kept in ignorance was peculiarly in the possession of the defendant because of a fiduciary relationship in which he stood to the plaintiff.

The case of Wilson v. Le Moyne (C. C. A.) 204 F. 726, which involved an action at law, and which defendant stresses as a precedent for requiring some affirmative action on the part of the plaintiffs, is entirely consistent with what has just been said. There, the Circuit Court of Appeals, in construing article 57, section 14, of the Maryland Code, declared that where one without investigation takes title to a tract of land but makes no effort whatsoever to ascertain whether he has obtained a good title, and rests content and does not bring his suit within the statutory period, he cannot be heard to say that he has exercised ordinary diligence to discover any fraud which may have been practiced upon him. It is to be noted that in that case the court was not only not dealing with a fiduciary relationship but with title to land where opportunity was afforded by the public records, open to all persons, to discover the true facts. There is no intimation in that decision of a tendency on the part of the court to give to the statute the narrow construction for which the defendant here contends.

The court concludes that none of the grounds set forth in the demurrers to the replications is meritorious, and therefore the demurrers are overruled.

### Opinion on Prayers and Rendering Verdict.

On the question of the prayers, I have concluded that I must reject all of defendant's prayers except No. 13. There are, of course, parts of those rejected prayers which state the law accurately, but I find in every one of them some part which does not concur with the theory that I have of the law applicable to the contract, and I am passing now only on the questions of law. I think the defendant's prayer No. 13 correctly states the rule of damages, to which I shall have occasion to allude again in a moment.

Turning to plaintiffs' prayers, all of plaintiffs' prayers with the exception of No. 1 and No. 7 are granted. Prayer No. 1 is inconsistent with the damage prayer of defendant which I have just granted, and therefore I am compelled to reject No. 1. By my rulings in the course of the trial, I have already passed upon prayer No. 7.

Turning now to the verdict of the court sitting as a jury, the court finds for the plaintiff in each of the three cases. The verdict in the first case, No. 3888, is for the plaintiff in the sum of $3,120, with interest in the sum of $2,227.65, making a total of $5,347.67. In

the second case, No. 3889, the verdict is for the plaintiff in the sum of $5,276.98, with interest in the sum of $2,137.05, making a total of $7,414.03. In the third and last case, No. 3890, the verdict is for the plaintiff in the sum of $933.15, with interest in the sum of $186.38, making a total of $1,119.53.

In giving this verdict I will state my reasons for so doing. The contract seems to me to be capable only of the construction for which the plaintiffs have contended, with the exception of their contention as to the rule of damages, and on that I have, as the verdict evidences, adopted the defendant's argument.

█ I am at a loss to understand how a reasonable construction of paragraph 7 would warrant the inclusion of the words contended for by the defendant, namely, that what that clause refers to is a larger contingent commission than 5 per cent. granted "by the Eastern Union." I think that to introduce the words "by the Eastern Union" would be to torture the language of the contract. It is, of course, true, as contended by defendant, that when this bargaining took place, uniformity was the goal that all interested in the contract were seeking. But it is equally true that the Eastern Union is not a party to the contract, and we must look to what the parties intended as expressed by the contract in order to arrive at its proper construction.

It is significant, it seems to the court, that there is no mention of the Eastern Union in the contract prior to paragraph 7; also that the Union is expressly named only when the Union has to do something or where the Union's approval is expressly contemplated, as for example, in paragraph R.

It seems clear to the court that what the agent insisted upon in signing the contract, and what the insurance company agreed to give it, was protection against higher commissions being paid anywhere throughout the section that affected this agent. In other words, I have no doubt in my mind that what the agent expected to get was entire uniformity. If we concede that all the Insurance Company of North America could obligate itself to give in this single contract was such uniformity as it could itself enforce, then it seems to me we are forced to the one logical conclusion that the company did obligate itself, in so far as its own agents were concerned, to put them on an equality.

The words "the agents in any large city" are used. What does "the agents" mean? As already pointed out, prior to this section the contract does not speak with relation to the Eastern Union, but speaks only of what the commissions, flat and contingent, shall be. There is some ambiguity. Prima facie the language is capable, perhaps, of several constructions, and it is for that reason that I allowed extrinsic evidence, the evidence of circumstances surrounding the formation of the contract, to be introduced. But after hearing that evidence, I am all the more confirmed in my opinion that the construction sought for by the defendant is not tenable. It is true the plaintiffs had been told that the Union had not succeeded in having its uniform contract adopted in Boston. But this is the very reason why the Baltimore underwriters insisted upon the clause, namely, they wanted protection against that very kind of contingency that happened. There is no proof that the parties intended this protection to be governed by the Union's success or failure. If they had so intended it is reasonable to suppose that this intent would have been definitely expressed.

So much for the question as to the part that the efforts of the Eastern Union were intended to play.

█ It is, of course, true, as contended by the defendant, that if the present plaintiffs stand in an entirely different relationship to the company from what the agent of the company in Boston stands, then there might be an implied argument that that other type of agent, the Boston type, was not contemplated, and that would be another ground for refusing to put the plaintiffs on a parity with the Boston agent.

The court is not impressed, however, with that argument, when applied to the present facts. The only limitation expressed in the contract is that the other agent must be one that is paid by contingent commissions. That is the only expressed limitation. Now, then, do we find any actual difference except a difference of degree? The court thinks not. The court thinks that the differences are differences of form and not of substance. If we look to the scope of territory, the authority, both general and special, the relative size of the business, the powers, such as the power to adjust losses, and innumerable other powers, the court is forced to the conclusion that the difference is one largely of name, and the actual difference is not one that should put the Boston agent in a different classification.

That seems to be very forcibly brought out by the testimony of Mr. Shallcross when he stated that the use of the name "Managers" in Boston for an agency of this kind,

was anomalous; that it was anomalous in Boston and only one or two other localities; that that term usually implied an agency paid entirely by salary, and that the term usually given to the type of agent as existed in Boston was "General Agent." To all intents and purposes that is what the plaintiffs are and were throughout the periods that are in controversy in this case.

There is a great deal more that might be said with respect to the reasons for adopting this construction. The court has been very greatly helped by the thorough argument and by a very exacting and thorough presentation of the case. But summarizing the situation as presented by the contract, it is simply this, that the court concludes that when the words "the agents in any other large cities" were put in the contract, both parties intended them to refer to this defendant's agents, and that the whole history of the negotiations leading up to this agreement indicates that the plaintiffs felt they were entitled, and said they were entitled, to nondiscriminatory treatment, they expected nondiscriminatory treatment all over the Union's territory, and they claimed expressly, as I construe this contract, nondiscriminatory treatment from the party they were dealing with, namely, the Insurance Company of North America. While it is not, perhaps, very artistically stated, I think that is the necessary, fair meaning to be put upon this language. Any other construction would, it seems to me, enable the defendant to fall back upon an argument which is not tenable under all the circumstances, and would not express the very purpose which underlies the cooperative spirit in which the matter was approached and negotiated.

There remains for me to discuss the question of limitations, although it follows as a result of the verdict that the court sitting as a jury has rendered, that the suits have not been barred by limitations. The court feels it can add very little on that point to what has been said in the opinion given when the matter was here on demurrer. The court rests its conclusions on the fiduciary relationship between the parties, and has been referred to no cases, nor does it know of any, where a different rule would apply than that which is here announced, namely, that there is no obligation on the part of an insurance agent under a situation of this kind to pry around, or to inquire, in order to determine whether or not it is entitled to more money than it is being paid.

The situation is exactly the same, as I construe it, as that which surrounds the beneficiary under the average trust agreement. If you have, however, something that is within the beneficiary's own peculiar knowledge, or is not based upon the fiduciary relationship, the situation is different. Here I fail to see why it is not entirely reasonable to say that the agent, looking to the company to be paid, had a right, after the submission of the statements (whether we assume the statements were made up by the agent alone, or by the company alone, or were made up jointly), to sit back and assume that the computed contingent commission would be one not in violation of the contract. The fact that he might have inquired of the home office, that he might have picked up the information as part of general knowledge, does not seem to me to impose on the agent the obligation to have brought suit earlier just because he might have gotten that information. Of course, if he had actually obtained it, that is a different question, but there is no proof here that the agent actually had the information prior to the three-year period.

■ I have adopted the defendant's suggested measure of damages because it seems to me that it would be inequitable to the defendant to adopt merely the rate of the increased contingent commission without taking into account what was clearly contemplated by the parties, namely, a very definite, specific manner of computing the net amount on which the rate would be based. That is set out in this same paragraph of the agreement, and therefore when the agreement says that the Baltimore agent should get a higher rate if some other agent of the company in another large city got a higher rate, it is implied that that higher rate should be applied to the same basis of calculation. Otherwise that parity which is the result expressly sought and promised would be defeated.